# MARYLAND ACTION FOR FOSTER CHILDREN, INC. ET AL. *v.* STATE OF MARYLAND ET AL.

[No. 5, September Term, 1976.]

*Decided January 7, 1977.*

134

*Motion for reconsideration filed February 4, 1977; denied February 18, 1977.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ., and RICHARD P. GILBERT, Chief Judge of the Court of Special Appeals, specially assigned.

*Richard S. Kahn* for appellants.

*Amicus curiae* brief filed on behalf of the President of the Senate of Maryland and the Speaker of the House of Delegates of Maryland, acting jointly on behalf of the Policy Committee of the General Assembly of Maryland, *H. Vernon Eney* and *Judith A. Armold* on the brief.

*Carl E. Eastwick, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Henry R. Lord, Deputy Attorney General, George A. Nilson* and *Joel J. Rabin, Assistant Attorneys General,* on the brief, for appellees.

ELDRIDGE, J., delivered the opinion of the Court. MURPHY, C. J., and SMITH and DIGGES, JJ., dissent and MURPHY, C. J., filed a dissenting opinion in which SMITH and DIGGES, JJ., concur at page 153 *infra.* SMITH, J., filed a dissenting opinion in which MURPHY, C. J., and DIGGES, J., concur at page 163 *infra.*

This case presents questions involving the budget and appropriation provisions of the Maryland Constitution.

The particular dispute here concerns payments for the foster care of children under two separate programs maintained by the State of Maryland. One program, pursuant to Maryland Code (1957, 1969 Repl. Vol.), Art. 88A, is administered by the Social Services Administration of the Department of Human Resources (formerly the Department of Employment and Social Services) and involves payments to foster parents for the care of "neglected or dependent children." The other program, pursuant to Code (1974, 1976 Cum. Supp.), § 3-820 (b) (2) of the Courts and Judicial Proceedings Article, is administered by the Juvenile Services Administration of the Department of Health and Mental Hygiene and involves payments to foster parents on behalf of those children committed by juvenile courts and placed in foster homes. Prior to 1974 the monthly rates of payment to foster parents under both programs were not dealt with by statute; instead the rates were administratively determined, based upon the funds appropriated for each program in the annual State budgets. Moreover, the payment rates were not the same under each program, as the amount paid monthly for the foster care of a child under the program administered by the Social Services Administration was less than the amount paid under the program administered by the Juvenile Services Administration.

At its 1974 session the General Assembly passed House Bill 326, which upon the Governor's signature became Ch. 867 of the Acts of 1974, and which added new § 60B to Art. 88A of the Code (1957, 1969 Repl. Vol., 1976 Cum. Supp.). Subsection (a) of new § 60B required the Social Services Administration to "establish by regulation eligibility guidelines for payment for one or more classifications of children receiving boarding care (foster care) who are in need of special care." Subsection (b) of new § 60B provides that after July 1, 1975, the monthly rate paid by the Social Services Administration for the foster care of children "described in the classification which is given the most demanding type of care provided in single family homes shall not be less than the monthly rate for care purchased in a single family home" by the Juvenile Services Administration. Subsection (b) goes on to provide: "This rate shall not be lower than that paid in fiscal year 1975."

Notwithstanding the provisions of Art. 88A, § 60B (b), the Budget Bill submitted by the Governor to the General Assembly in January 1975, for the fiscal year 1976, commencing July 1, 1975, made appropriations for the two foster care programs on the basis of unequal rates of payment. Although the requirement that the rate paid by the Social Services Administration "shall not be lower than that paid in fiscal year 1975" was complied with, the appropriation for the Social Services Administration program was insufficient to comply with the requirement that the monthly rate "shall not be less than the monthly rate" paid by the Juvenile Services Administration.

During the 1975 legislative session the Senate passed a resolution, Senate Resolution No. 109, which referred to Art. 88A, § 60B (b), and which requested the Governor "to provide funds to increase family foster care payments" by the Social Services Administration to a level sufficient for the standard of § 60B (b) to be met. However, the Governor did not amend or supplement the Budget Bill submitted to the General Assembly so as to increase the appropriation for the foster care program administered by the Social Services Administration. As the General Assembly could not

constitutionally increase this appropriation, the Budget Bill as enacted at the 1975 session contained appropriations for the two foster care programs reflecting unequal rates of payment. The General Assembly did not, as it could have under Art. III, § 52 (8) of the Maryland Constitution, enact a Supplementary Appropriation Bill to appropriate the funds necessary for the increased rate of payment under the Social Services Administration program.

Thereafter, the "Maryland Action for Foster Children, Inc.," an association involved in the "promotion of an effective foster care program for children without parents," and several individual foster parents, brought this suit in the Circuit Court for Baltimore County against the State of Maryland, the Governor, the Comptroller, the Treasurer, and the Secretary of Budget and Fiscal Planning. The plaintiffs sought a writ of mandamus ordering the defendants to pay all foster parents in the State of Maryland who were providing boarding care for foster children no less than the minimum sum mandated by Art. 88A, § 60B (b). The plaintiffs also sought an order requiring retroactive payments to such foster parents, as a supplement to the monies already paid since July 1, 1975, the effective date of Art. 88A, § 60B (b). The defendants filed a motion raising preliminary objection or, in the alternative, a demurrer to the petition for a writ of mandamus.[1]

The circuit court, after a hearing and after rendering an opinion, denied the motion raising preliminary objection but sustained the defendants' demurrer without leave to amend. The circuit court in its opinion held that Ch. 867 of the Acts of 1974, adding new § 60B to Art. 88A of the Code, was "a supplemental appropriation bill which is unconstitutional because it fails to contain within itself the means of providing the monies to pay for the costs thereof." While holding that § 60B was unconstitutional as an invalid appropriation bill, the circuit court stated that "it has, in effect, the same weight and value as a joint resolution of the Legislature . . . ."

1. The defendants made no objection based upon improper venue, and thus we do not consider the matter.

The plaintiffs, in their appeal from the circuit court's order, concede that if Art. 88A, § 60B (b) amounts to an attempted appropriation, it is unconstitutional because it fails to meet the requirements for a Supplementary Appropriation Bill which are set forth in Art. III, § 52 (8) of the Maryland Constitution. The plaintiffs, however, argue that the circuit court erred in holding that § 60B (b) constituted an appropriation measure. They claim that it is a valid law setting forth the policy of the State.

The plaintiffs apparently recognize that if § 60B (b) does not constitute a valid appropriation measure, mandamus would not lie to compel any of the defendants to pay the monies from the State Treasury which the plaintiffs sought in this case. See Art. III, §§ 32 and 52 of the Maryland Constitution; Red Star Line v. Baughman, 153 Md. 607, 610-611, 139 A. 291 (1927); McPherson v. Leonard, 29 Md. 377, 389-390 (1868); Thomas v. Owens, 4 Md. 189, 229-231 (1853). See also Panitz v. Comptroller, 247 Md. 501, 516, 232 A. 2d 891 (1967). Consequently, in their brief and argument before us, the plaintiffs do not seek relief against any of the defendants other than the Governor, and they do not seek an order requiring the payment of monies. Instead, they insist that they are entitled to an order requiring the Governor to comply with § 60B (b) "in the preparation of all future budgets."

The President of the Maryland Senate and the Speaker of the House of Delegates, on behalf of the Policy Committee of the General Assembly, have filed a brief as Amicus Curiae, taking essentially the same position as the plaintiffs do in this Court.

The defendants agree that Art. 88A, § 60B (b) is not an appropriation measure. They argue, however, that, in the absence of a Supplementary Appropriation Bill enacted by the General Assembly, the funding of § 60B (b) is constitutionally committed to the discretion of the Governor. Since mandamus will not lie to control the exercise of discretion by a public official, Balto. County v. Egerton Realty, 217 Md. 234, 238, 140 A. 2d 510 (1958); Hillyard v. Chevy Chase Vill., 215 Md. 243, 246-247, 137 A. 2d

555 (1958); *Red Star Line v. Baughman, supra,* 153 Md. at 610, the defendants take the position that the circuit court's order sustaining their demurrer should be affirmed even though the circuit court's reasoning may not have been entirely correct.

Preliminarily, we agree with all of the parties that Art. 88A, § 60B (b) is not an appropriation measure, and thus compliance with the constitutional requirements for a Supplementary Appropriation Bill was unnecessary. Section 60B (b) does not purport to appropriate money out of the State Treasury or direct the Comptroller, Treasurer or anyone else to make payments of money. *Cf. Winebrenner v. Salmon,* 155 Md. 563, 566-567, 142 A. 723 (1928); *Baltimore v. O'Conor,* 147 Md. 639, 128 A. 759, 40 A.L.R. 1058 (1925); *McPherson v. Leonard, supra,* 29 Md. at 389-390. The statute regulates the manner by which the Social Services Administration is to carry out a particular program, setting certain guidelines in paying for a service under the program, but leaving it to another bill, such as the annual Budget Bill, to determine the amount of money available for the program. A bill merely fixing the criteria for paying for a service, but leaving it to the annual Budget Bill to determine the amount of money appropriated for that purpose, is not itself an appropriation measure. *Cf. Dorsey v. Petrott,* 178 Md. 230, 249, 13 A. 2d 630 (1940).

Consequently, the circuit court erred in holding that Art. 88A, § 60B (b) was unconstitutional as an invalid appropriation measure and that it only had the weight and value of a joint resolution. As § 60B (b) was not an appropriation of money, it did not have to comply with the requirements for a valid appropriation bill set forth in Art. III, § 52 (8) of the Maryland Constitution. Section 60B (b) is a constitutional statute, setting forth valid criteria for the administration of a particular government program. Assuming that sufficient funds were to be appropriated for the purpose and that no other provision of law would have a bearing on the matter,[2] the Social Services Administration

---

**2.** *But see, e.g.,* Code (1957, 1976 Repl. Vol.), Art. 15A, § 11.

would be required to comply with the criteria set forth in Art. 88A, § 60B (b).

The issue in this case, therefore, comes down to whether the Governor has a mandatory duty, in the preparation of future annual budgets, to provide sufficient funds for compliance with Art. 88A, § 60B (b). The resolution of this question involves a consideration of the budget provisions of the Maryland Constitution, set forth in Art. III, § 52. Although the requirements and historical background of § 52 have been dealt with by this Court on several occasions, *Panitz v. Comptroller, supra; McKeldin v. Steedman,* 203 Md. 89, 98 A. 2d 561 (1953); *Dorsey v. Petrott, supra; Baltimore v. O'Conor, supra,* the particular issue presented here has not been decided previously by the Court.

Article III, § 52 of the Constitution, known as the "budget amendment," was first adopted in 1916 and has been amended on several occasions since. It provides for a comprehensive executive budget system for the State of Maryland. Section 52 (1) mandates that the General Assembly "shall not appropriate any money out of the Treasury except in accordance with the provisions of this section." Subsection (2) provides that "[e]very appropriation bill shall be either a Budget Bill, or a Supplementary Appropriation Bill, as hereinafter provided." In subsection (3), the Governor is directed to submit to the General Assembly in January of each year a Budget for the next fiscal year which shall, *inter alia,* contain a complete plan of proposed expenditures and estimated revenues for that fiscal year.

Subsections (4), (11) and (12) of § 52 describe more precisely what is to be contained in the Budget as submitted by the Governor. Subsection (4) states:

"Each Budget shall embrace an estimate of all appropriations in such form and detail as the Governor shall determine or as may be prescribed by law, as follows: (a) for the General Assembly as certified to the Governor in the manner hereinafter provided; (b) for the Executive Department; (c) for

the Judiciary Department, as provided by law,
certified by the Comptroller; (d) to pay and
discharge the principal and interest of the debt of
the State in conformity with Section 34 of Article 3
of the Constitution, and all laws enacted in
pursuance thereof; (e) for the salaries payable by
the State and under the Constitution and laws of
the State; (f) for the establishment and
maintenance throughout the State of a thorough
and efficient system of public schools in conformity
with Article 8 of the Constitution and with the laws
of the State; (g) for such other purposes as are set
forth in the Constitution or laws of the State."

Subsection (11) provides that, for the purpose of making up
the Budget, the Governor shall require all State officials,
departments, offices, agencies, etc., to transmit to him
itemized estimates in such form as he shall direct.
Subsection (11) goes on to state:

"The estimates for the Legislative Department,
certified by the presiding officer of each House, of
the Judiciary, as provided by law, certified by the
Comptroller, and for the public schools, as provided
by law, shall be . . . included in the Budget without
revision."

Subsection (12), after authorizing the Governor to hold
public hearings on all estimates, provides that after such
hearings the Governor "may, in his discretion, revise all
estimates except those for the legislative and judiciary
departments, and for the public schools, as provided by law."

The Governor is required by subsection (5) of § 52 to
deliver to the presiding officer of each House of the General
Assembly, in addition to the Budget itself, a bill embodying
the proposed appropriations set forth in the Budget, and the
presiding officers are required to have such bill introduced
promptly. The bill, which is to be known as the "Budget
Bill," may with the consent of the General Assembly be
amended or supplemented by the Governor at any time prior

to final passage by the General Assembly. Under subsection (5a), adopted in 1974, both the Budget and the Budget Bill submitted by the Governor must be balanced so that "the figure for total proposed appropriations shall not exceed the figure for total estimated revenues." The Governor in submitting amendments or supplements to the Budget Bill, and the General Assembly in amending the Budget Bill, are prohibited from causing the total proposed appropriations to exceed the figure for total estimated revenues.

The heart of the executive budget system is subsection (6) of § 52, which restricts the authority of the General Assembly to amend the Budget Bill. The General Assembly is prohibited from amending the Bill so as to affect the obligations of the State with respect to State debts or to affect the provisions made by statutes for the establishment and maintenance of the system of public schools or to affect the payment of salaries required to be paid by the Constitution. The General Assembly is authorized to increase or diminish the items relating to the General Assembly or to the Judiciary. However, with respect to all other items, the General Assembly may amend the Budget Bill only by striking out or reducing such items. It may not increase the proposed appropriations in the Budget Bill for anything other than the General Assembly itself or the Judiciary.

If the Legislature desires to make other appropriations, it must do so in accordance with subsection (8) of § 52. That subsection requires, among other things, that "[e]very such appropriation shall be embodied in a separate bill limited to some single work, object or purpose therein stated and called herein a Supplementary Appropriation Bill" and that "[e]ach Supplementary Appropriation Bill shall provide the revenue necessary to pay the appropriation thereby made by a tax, direct or indirect, to be levied and collected as shall be directed in said bill ...." With respect to these two requirements, *see Panitz v. Comptroller, supra,* 247 Md. at 509-513; *McKeldin v. Steedman, supra,* 203 Md. at 99-101.

Section 52 (14) states that in the event of any inconsistency between the provisions of § 52 and any other

provisions of the Constitution, the provisions of § 52 shall prevail. Subsection (14) goes on to provide, however, that nothing in § 52 shall affect Art. III, § 34 of the Constitution (concerning State debt, credit, and related matters). Finally, subsection (14) provides that § 52 shall not be construed as preventing the Governor from calling extraordinary sessions of the General Assembly and the General Assembly from considering at such extraordinary sessions any emergency appropriations.

The historical background of Art. III, § 52, is pertinent to the issue here. The manner by which appropriations were made prior to 1916, and some of the problems caused thereby, were described in a publication by Hooper S. Miles, a former Treasurer of Maryland, entitled *The Maryland Executive Budget System,* pp. 8-10 (1942), as follows:

> "It was customary, under the former method, for the Governor to appear in person before a joint meeting of the members of the House of Delegates and the Senate, at the beginning of every regular session of the Legislature, and to address them on 'the condition of the State,' — in the course of which he was expected to direct their attention to the essential needs of the State, and to specifically recommend to their consideration such measures as he judged necessary. Having thus discharged the responsibility imposed upon him by the Constitution, the Governor must thereafter await the final disposition of his recommendations by the Legislature, whose members were free to adopt, alter or entirely ignore any or all of them, except in so far as the Governor, by virtue of his prestige and his influence with the members of the Legislature, might affect the course of his recommendations through the Legislature.

> "It is true, the Governor then had the 'power to disapprove of any item or items of Bills making appropriations of money' and to thus void the items which he disapproved. However, his use of this veto

power on individual items had to be exercised with rare discrimination and with an intimate understanding of the temper of the Legislature, to avoid the danger of antagonizing powerful groups in the Legislature, and thereby jeopardize all of his recommended measures. Consequently, he was ever conscious of the fact that, in addition to the complete discretion vested in the Legislature in its consideration of his proposals, it also could 'proceed to reconsider' and repass, any of the vetoed items, by the affirmative vote of 'three-fifths of the members elected' to each 'House,' viz: The House of Delegates and the Senate.

"The power to fix the fiscal policies and determine the course of the fiscal operations of the State was, therefore, exclusively vested in the Legislature, subject only to the mild restraint of the limited veto powers of the Governor, and whatever power of persuasion he might be capable of exercising with individual members of the Legislature.

"The old method often witnessed 'log-rolling' or 'you help me and I'll help you' tactics among many of the members of the Legislature in their efforts to insure passage of the particular appropriations in which they had some selfish or political interest. It was not unusual for excessive appropriations to result from such tactics and also from the pressure of political and professional lobbyists; and, almost as frequently, some of the most important activities or needs of the State were either overlooked or sadly neglected in what was commonly termed, the 'Pork Barrel' scramble.

"The present Budget System, which is technically known as the 'State Executive Budget System,' was designed to correct these conditions, and to impose upon the Governor the primary responsibility of controlling the fiscal policies and operations of the State."

The circumstances leading to the adoption of the executive budget system were also summarized by this Court in *McKeldin v. Steedman, supra,* 203 Md. at 96:

"In common with other states of the Union, Maryland less than four decades ago had no orderly system of planned public expenditures. Appropriations for various purposes were made piece-meal by the General Assembly, each project receiving independent consideration without relation to other claims upon the public purse. In earlier times, when the range and scope of state activities were limited, this planless procedure was not seriously objectionable, for it was nevertheless not impossible for members of the legislature to have a fairly clear grasp of the state's fiscal operations. Eventually, however, with the growth in the size and complexity of governmental programs and machinery, embarrassing deficits occurred. A particularly disturbing experience of this nature happened in the year 1915, when there was a deficit of $2,000,000 in the State Treasury."

In 1915, a Commission, designated "The Commission on Economy & Efficiency on the Budget System," was appointed to submit recommendations with regard to the fiscal problems of the State. The Commission, known as the "Goodnow Commission" because of its chairman, Dr. Frank J. Goodnow, president of the Johns Hopkins University, submitted in 1916 a report and proposed constitutional amendment, which are printed in the *Journal of Proceedings of the Senate of Maryland,* for the Legislative Session of 1916, pp. 129-134. That proposed amendment, after adoption by the General Assembly and ratification by the voters, became Art. III, § 52 of the Constitution.

The Goodnow Commission's report reveals that the proposed executive budget system was designed to bring about a fundamental change in State appropriations. The report stated (*Senate Journal, supra,* pp. 130-131):

"The present excess of expenditures over receipts,

"which has resulted in the large accumulated deficit, is ample proof of the proposition that the methods of making appropriations now in force are defective."

The major changes which the Commission recommended, and which are embodied in Art. III, § 52, were summarized by the Commission as follows (*id.* at 133-134):

"Our thought in drafting the proposed amendment has been:

"First — To impose upon the Governor the sole responsibility, within the limits of the Constitution and the provisions of existing law, of presenting to the Legislature a complete and comprehensive statement of the needs and resources of the State . . . .

"Second — To make it impossible for the Legislature so to change the plans proposed by the Governor as to produce a deficit; but

"Third — To permit the Legislature to make provision for any purpose not included in the Governor's plan on the condition that it provide also for the revenue which the accomplishment of its purpose necessitates."

The Commission deemed the limitation upon the Legislature's authority over the Governor's proposed Budget "fundamental in our judgment for a sound budget system." (*Id.* at 130.) The report went on (*id.* at 131):

"The most difficult problem, in connection with the formulation of a budget plan which presented itself to the Commission was the determination of the powers of the Legislature relative to the estimates to be submitted by the Governor to the Legislature. It was recognized that the weakness of all American financial methods, in the Congress of the United States, as well as in the Legislatures of the separate States, was to be found in the practice to which all American legislative bodies are

> addicted of adding either to the amounts demanded
> by the administrative departments, or to the items
> for which appropriations were asked."

While it was intended that the Legislature also have authority to initiate appropriations, the Commission's report made it clear that the Legislature should assume responsibility for providing the revenue for such appropriations initiated by it (*id.* at 131-132):

> "The Commission feels, however, that a broader
> latitude should be given a legislative body in
> financial matters . . . provided the latitude so given
> cannot be used in such a manner as to produce a
> deficit in the State's finances.
>
> * * *
>
> "For these reasons the Commission is of the
> opinion that it is advisable to give the Legislature
> the power to initiate appropriations for objects for
> which the Governor has made no estimates. The
> Commission feels, however, that it is necessary to
> prevent the recurrence of deficits in the finances of
> the State, and to fix the responsibility of any
> derangement of the financial plans of the Governor.
> It has accordingly framed the proposed
> constitutional amendment in such a way as to
> permit the Legislature . . . to appropriate money for
> a purpose not included in the Governor's estimates,
> on the condition that provision is made in the act of
> appropriation for the levy of a tax sufficient in
> amount to defray the expenses necessitated by such
> act of appropriation." [3]

---

3. For further discussion of the background of the executive budget system embodied in Art. III, § 52, and the requirements of that system, *see* a series of articles by each member of the Goodnow Commission published in the Baltimore *Sun* on September 4, 1916 (by James Alfred Pearce, previously a judge of this Court), September 11, 1916 (by Philip D. Laird who had been Speaker of the House of Delegates), September 18, 1916 (by William Milnes Maloy, a former State Senator), September 25, 1916 (by Francis Neal Parke who was later to become a judge of this Court), October 2, 1916 (by Joseph D. Baker), October 9, 1916 (by B. Howell Griswold, Jr.), and October 16, 1916 (by the chairman, Dr. Frank J. Goodnow). *See, in*

The provisions of the Budget Amendment to the Maryland Constitution, Art. III, § 52, and the purposes underlying those provisions set forth in the Goodnow Commission's report, compel the conclusion that the funding of Art. 88A, § 60B (b) of the Code in future annual budgets is a matter constitutionally committed to the Governor's discretion. For a court to require that the Governor fund the foster care program administered by the Juvenile Services Administration at a particular level in future Budgets prepared and submitted by the Governor would be inconsistent with several provisions of the Budget Amendment to the Constitution.

The plaintiffs' position in this case cannot be squared with subsections (3) and (6) of the Budget Amendment. As previously discussed, those subsections require that the Governor annually submit "a complete plan of proposed expenditures," with the General Assembly being prohibited from increasing the Governor's proposed expenditures except for those items relating to the General Assembly itself or the Judiciary. If the General Assembly could fix by statute spending levels for particular programs which are higher than those proposed by the Governor, but with which the Governor must comply in preparing and submitting future Budget Bills, the General Assembly would then be able to increase the proposed appropriations in the Budget Bill. The Legislature could then accomplish indirectly what the Constitution forbids. We would no longer have an executive budget system with the Governor proposing a "complete plan of proposed expenditures" (Art. III, § 52 (3)). Instead, the plan would be dictated by a multitude of legislative enactments.

Moreover, a holding that the Governor, in the preparation and submission of the Budget and Budget Bill, has a mandatory duty to comply with all spending levels fixed by ordinary statutes, is inconsistent with subsection (8) of § 52

addition, *Report of the Constitutional Convention Commission* (1967), pp. 225-240; *The Maryland Budget System, Being the First Interim Report by the Commission on Administrative Organization of the State of Maryland* (1951); *Report of the Maryland Commission on the Distribution of Tax Revenues* (1946), pp. 11-13; Note, 28 Md. L. Rev. 395 (1968).

which delineates the requirements for legislatively initiated appropriations in the form of "Supplementary Appropriation Bills." Under such a holding, the Legislature would in effect be able to initiate appropriations merely by specifying funding levels without having to provide the revenue by tax provisions incorporated in the statutes.

In *McKeldin v. Steedman, supra*, 203 Md. at 99-101, a section of a Supplementary Appropriation Bill providing that general funds be used for the appropriation, and directing the Governor to include in his annual budget a sufficient amount for that purpose, was held unconstitutional. The Court in that case pointed out that there were two reasons for the requirement in Art. III, § 52 (8) of the Maryland Constitution, that a Supplementary Appropriation Bill provide the revenue necessary to pay the appropriation by a tax. The first reason was "to assure necessary revenue to cover the authorized expenditure." The second reason was "that legislators will be less facile in passing Supplemental Appropriation bills if they must in the same act assume the uncongenial task of directing a specific tax." (*Id.* at 99.) In holding that the section of the Supplementary Appropriation Bill violated both of these purposes, the Court stated (*id.* at 100-101):

> "However, the use of *general* funds to defray the supplemental appropriation is not what the Constitution contemplates or permits. Calling on the Governor, as Section 9 does, to cover the supplemental item by *general* funds is not what the Constitution allows. Section 9 evades and frustrates the constitutional mandate for the levy and collection of an annual tax for this purpose.
>
> "The earnest debate of counsel as to whether Section 9 relates to surplus funds only or all general funds is inconclusive. If we grant for the sake of argument that Section 9 operates upon surplus funds only, it still evades the requirement of a tax to be provided in the Supplemental Appropriation law. If Section 9 be viewed as operating upon

general funds, surplus and other, it diminishes the funds upon which the Governor may rely in balancing his budget. But even more significantly, the Section attempts to circumvent the critically important constitutional requirement by shifting from the legislature to the Governor the public *onus* of being charged with the necessity for an additional tax."

The same may be said with respect to the plaintiffs' position in the instant case. If, when the General Assembly enacts an ordinary statute requiring that a program be funded at a particular level, the Governor *must* fund the program at that level, both purposes of § 52 (8) would be frustrated. The General Assembly would be initiating an appropriation without taking the responsibility of assuring necessary revenues, and it would not be assuming "the *onus* of imposing a tax . . . ."

The purpose of subsections (6) and (8) of § 52, prohibiting the General Assembly from increasing the appropriations in the Budget Bill and requiring that a Supplementary Appropriation Bill contain a tax provision supplying the necessary revenue, was, as the Goodnow Commission's report and other historical documents make clear, to prevent deficits. This requirement of a balanced budget has been explicit since the adoption of subsection (5a) in 1974. If the Governor were required to comply with numerous statutes such as Art. 88A, § 60B (b), mandating higher spending levels but not providing the revenue, the result could be a return to the deficit spending prevalent in the years before 1916 and inconsistent with the balanced budget requirement in subsection (5a).

Finally, the view of the plaintiffs in this case overlooks the careful distinction made in Art. III, § 52 of the Constitution, between those items which the Governor must fund in the Budget at levels prescribed by law and the remaining items which he may, in his discretion, reduce. Article III, § 52 (4), lists the various categories of appropriations which the Governor is to include in the Budget, such as the

appropriations for the General Assembly (§ 52 (4) (a)), for the Executive Department (§ 52 (4) (b)), for the Judiciary (§ 52 (4) (c)), to pay the State debt (§ 52 (4) (d)), and for the public schools (§ 52 (4) (f)). Lastly, § 52 (4) (g) is a general direction to the Governor to include estimated appropriations "for such other purposes as are set forth in the Constitution or laws of the State." [4] Section 52 (11) then specifies which of the categories of appropriations must be included in the Budget as received by the Governor, without revision by him. They are the estimates for the General Assembly certified by the presiding officer of each House, the estimates for the Judiciary certified by the Comptroller, and the estimates for the public schools as provided by law. Section 52 (12) expressly authorizes the Governor, "in his discretion," to "revise all estimates except those for the legislative and judiciary departments, and for the public schools, as provided by law." Consequently, the Constitution itself gives the Governor authority to reduce estimated appropriations in all categories except those for the General Assembly, for the Judiciary and for the public schools as provided by law.[5] The Legislature, by enacting statutes specifying minimum spending limits, cannot deprive the Governor of the discretion which the Constitution explicitly vests in him. Moreover, if the Legislature could, in all areas, provide by law for minimum funding which was mandatory upon the Governor, there would be no purpose for the distinctions made in subsections (11) and (12) of § 52.

---

4. Section 52 (4) (g) originally stated "for such other purposes as are set forth in the Constitution of the State." The phrase "or laws" was added by a re-writing of § 52 by Ch. 497 of the Acts of 1947, ratified by the voters November 2, 1948. As made clear from the title of Ch. 497, however, its sole purpose was to provide for annual sessions of the General Assembly instead of sessions every two years, and § 52, as well as other sections of the Constitution, had to be re-worded to accomplish this purpose. *See also Report of the Maryland Commission on the Distribution of Tax Revenues, supra,* which had recommended Ch. 497. It seems clear that the change in the wording of § 52 (4) (g) by Ch. 497 was not intended to cause any substantive change in constitutional budgeting requirements. The Governor, while obligated to fund programs provided for by law, still has the discretion to determine the level at which those programs are to be funded.

5. Of course, other constitutional provisions may also limit the Governor's revisory power, such as, *e.g.,* the prohibition against changing the salary of a public officer during his term (Art. III, § 35).

Long ago this Court recognized that it was inconsistent with the executive budget system for the General Assembly to fix the items and amounts in the Budget. In *Baltimore v. O'Conor, supra,* a 1924 statute requiring the disbursement of certain monies from the Treasury was held to be an invalid appropriation bill because it failed to meet the requirements for a Supplementary Appropriation Bill set forth in Art. III, § 52 (8) of the Constitution. One of the arguments made to sustain the constitutionality of the statute was that it was authorized by a particular provision of the Budget Bill enacted the same year (147 Md. at 649-650). The Court, in rejecting such contention, stated (*id.* at 650):

> "And finally, if Chapter 576 were held valid because of section 9 [of the Budget Bill], it would mean that the governor could delegate to the General Assembly *the power to fix the items and amounts of the budget bill, and the Budget Amendment would be destroyed.*" (Emphasis supplied.)

The same is true here, for if the General Assembly by enacting ordinary statutes can "fix the items and amounts of the Budget Bill," the executive budget system embodied in the Budget Amendment, Art. III, § 52, "would be destroyed."

In sum, Art. 88A, § 60B (b), relating to the foster care program administered by the Social Services Administration, is a valid law, embodying the public policy of the State, and setting forth criteria for carrying out a particular governmental program. However, as is the case with numerous other statutes, state, federal and local, the purpose underlying § 60B (b) cannot be fully achieved until sufficient funds are appropriated. In Maryland, this funding may be accomplished at a regular session of the General Assembly in one of two ways: (1) by the annual Budget Bill submitted by the Governor; or (2) by a Supplementary Appropriation Bill initiated by and enacted by the General Assembly itself. However, assuming that no other constitutional principle is violated, the Judiciary has no authority to control the Governor's discretion and require

him to include more funds in the Budget Bill to implement § 60B (b), just as it would have no authority to control the General Assembly's discretion and require that body to enact a Supplementary Appropriation Bill for the same purpose.

*Judgment affirmed.*
*Petitioners to pay costs.*

*Murphy, C. J., dissenting:*

While I agree that Chapter 867 of the Acts of 1974 is not an appropriation bill within the contemplation of the Budget Amendment, I think the majority has fallen into grievous error in concluding that the Governor has no duty under the Constitution of Maryland, in future annual budgets submitted by him to the General Assembly, to include funds necessary to comply with and implement the provisions of the statute. To impose such a mandatory duty on the Governor is not to cause the destruction of the executive budget system, as the majority suggests. Indeed, not to impose such a duty upon the Governor has far more deadly consequences; most certainly it would herald the demise of the delicate and time-honored balance existing between the power and responsibility of the legislature to make the laws and the Governor's duty to see that they are faithfully executed. There is nothing in the Budget Amendment, or in its history, which changes this fundamental allocation of power between the legislative and executive branches. The Governor had the power to veto the bill, which he did not exercise; once he signed it into law, he was bound to carry out its mandate. The result reached by the majority vests power in the Governor never envisaged by those who drafted the Budget Amendment. Under the majority's interpretation, the Governor enjoys unbridled authority to ignore the legislative will, or even worse, to decide, in his sole discretion, which enactments will be funded and which will not. I therefore dissent from the view adopted by the majority that the funding of Chapter 867 is a matter constitutionally committed to the Governor's discretion under the provisions of the Budget Amendment.

Chapter 867 of the Acts of 1974 became effective on July 1, 1974. It directed in no uncertain terms that the monthly rate to be paid by the State to foster parents for care of neglected or dependent children would be fixed at a specified monetary level after July 1, 1975. In the budget submitted by the Governor to the General Assembly in January of 1975 for fiscal year 1976, funds necessary to comply with the policy established by the legislature were not included.

The majority holds that if the General Assembly could fix by statute spending levels for particular programs which are higher than those proposed by the Governor, it would be able to increase the proposed appropriations in the Budget Bill in violation of the Budget Amendment and could result in deficit spending inconsistent with the constitutional requirement for a balanced budget. To permit this, according to the majority, is to allow the legislature to accomplish indirectly what the Constitution forbids because a legislatively initiated appropriation can only be made through enactment of a Supplementary Appropriation Bill which mandates imposition of a specific tax to raise the revenue necessary for the appropriation. The majority expresses the opinion that there is no mandatory duty upon the Governor to fund Chapter 867 in any event because he has authority under the Budget Amendment to "revise" estimated appropriations and may therefore reduce (or presumably eliminate) any item except estimated appropriations for the legislature, the judiciary, and for the public schools.

The Budget Amendment was not intended to circumscribe the plenary law-making power of the legislature to determine what the State's fiscal policy shall be. Rather it was the grand design of the executive budget system to bring about a fundamental change in the method of appropriating money from the State Treasury in order to make it impossible to produce a budget deficit. To this end, the General Assembly was prohibited by the Amendment from appropriating money out of the State Treasury except through the Budget Bill or, by a Supplementary Appropriation Bill. Subsection (3) of the Budget Amendment requires the Governor to submit a budget to the

General Assembly containing a complete plan of proposed expenditures and estimated revenues. That the items comprising the Governor's "plan" were not to be of his own original making is plain from subsection (4), which provides that the budget shall contain "an estimate of all appropriations . . . as follows:

(a) for the General Assembly as certified to the Governor in the manner hereinafter provided;

(b) for the Executive Department;

(c) for the Judiciary Department, as provided by law, certified by the Comptroller;

(d) to pay and discharge the principal and interest of the debt of the State in conformity with Section 34 of Article 3 of the Constitution, and all laws enacted in pursuance thereof;

(e) for the salaries payable by the State and under the Constitution and laws of the State;

(f) for the establishment and maintenance throughout the State of a thorough and efficient system of public schools in conformity with Article 8 of the Constitution and with the laws of the State;

(g) *for such other purposes as are set forth in the Constitution or laws of the State.*" (Emphasis added.)

Subsection 5 (a) requires that the total proposed appropriations contained in the Governor's budget as submitted to the General Assembly not exceed the figure for total estimated revenues. The subsection requires that the budget as ultimately enacted by the legislature after all amendments have been made be balanced, *i.e.*, that the figure for total estimated revenues be equal to or exceed the figure for total appropriations.

In producing his estimate of appropriations, the Governor is authorized by subsections (11) and (12) to require all officials and agencies applying for State appropriations to provide him with itemized estimates. He is authorized to

provide for public hearings on all estimates and to revise such estimates submitted to him except estimates prepared for the legislative and judicial departments, and for the public schools; as to these, the Governor is required to include them in his budget without revision. Once the Governor submits the budget to the General Assembly, subsection (6) provides that it may not be amended to affect (a) the State's debt obligations, (b) provisions made for the public schools and (c) provisions made for the payment of salaries required by the Constitution of Maryland. The General Assembly is authorized by subsection (6) to amend the bill by increasing or decreasing items relating to the legislature and judiciary; it may not, however, otherwise amend the bill except "to strike out or reduce" other items contained in the proposed budget.

Subsection (8) of the Budget Amendment authorizes the General Assembly to pass Supplementary Appropriation Bills after the Budget Bill has been enacted. Such a bill is required to provide the revenue necessary to pay the appropriation thereby made by a tax to be levied and collected as the bill directs.

As our predecessors observed in *McKeldin v. Steedman*, 203 Md. 89, 97, 98 A. 2d 561, 564 (1953), the executive budget system imposes upon the Governor the sole responsibility of presenting to the legislature a complete and comprehensive statement of the needs and resources of the State; it makes it impossible for the legislature so to change the plan proposed by the Governor as to produce a deficit; but it permits the legislature to make provision for any purpose not included in the Governor's plan on the condition that it provide for the revenue which the accomplishment of its purpose necessitates.

The constitutional authority of the legislature to enact Supplementary Appropriation Bills under subsection (8) was obviously not intended to constitute the only means by which it could shape and implement the fiscal policy of the State through its law-making function. The prime mechanism through which the legislature could express its

fiscal will as elected representatives of the people was through enactment of the Budget Bill. The Budget Amendment requires that the budget submitted by the Governor contain those items mandated by subsection (4), which include appropriations "for such other purposes as are set forth in the . . . laws of the State." It is simply wrong to hold, as the majority does, that because the Governor may require those applying for public money to provide him with itemized estimates — which he may "revise" — that somehow this authority enables him, in his sole discretion, to exclude from his budget items plainly required to be included therein by subsection (4). The constitutional provision for Supplementary Appropriation Bills was not intended as a singular substitute for the basic power of the legislature to provide for the appropriation of money from the State Treasury; it simply assured "that the fiscal requirements of the State, as fixed in the Budget prepared by the Governor and passed by the General Assembly, shall not be enlarged unless a tax to meet the increased need is incorporated in the proposal as an integral part of it." *McKeldin v. Steedman, supra* (203 Md. at 99).

It is true, as the majority says, that the Governor's plan of estimated appropriations may be dictated by a multitude of legislative enactments and that this could result in the Governor's submitting a budget in an amount greater than *existing* revenues can defray. It is nevertheless his constitutional obligation under the Budget Amendment to include all constitutionally mandated items in his budget, as provided in subsection (4), and where he estimates that there will be a shortfall in available revenues, he must propose additional revenue measures for enactment by the legislature. Should the legislature fail to provide by law for the additional revenue, it will then have to strike out or reduce the appropriations provided in the Budget Bill in the manner permitted by the provisions of subsection (6) so as to bring the budget into constitutional balance, viz., total estimated revenues will be equal to or exceed total appropriations. Since a budget not in balance is unconstitutional and hence ineffective to appropriate money

out of the State Treasury, the Budget Bill can in no event produce a deficit.

That the General Assembly, by enacting a general law, can compel the Governor to include an appropriation in his. Budget Bill for the next ensuing fiscal year is hardly new or novel. The Attorney General has unequivocally so held. *See* 43 Op. Att'y Gen. 130 (1958); 53 Op. Att'y Gen. 95 (1968); 53 Op. Att'y Gen. 90 (1968); 59 Op. Att'y Gen. 64 (1974). To the same effect, *see* G. Bell, *State Budget Administration in Maryland* (Univ. of Md. Bureau of Governmental Research 1957) at 11; *1951 Report of the Commission on Administrative Organization of the State* (Sobeloff Commission).

Moreover, the Court has been greatly enriched in its consideration of this case by an amicus curiae brief filed on behalf of the President of the Senate and the Speaker of the House of Delegates of Maryland, acting jointly on behalf of the Policy Committee of the General Assembly of Maryland. Since the position taken by amicus corresponds with my own views, I quote from it liberally:

"Maryland's adoption of an executive budget system has resulted in no transfer from the General Assembly of its fundamental power to declare what the law shall be, in fiscal as in other matters. At most, the adoption of such a system shifted to the Governor a role of initiation or proposal; it did not give to the executive branch any power to overrule legislative policy determinations. The budget system arose from an existing problem and from the recognition that without some binding, rational plan for matching income and expenditures, the government was likely to incur mounting deficits. The purpose of the budget was to match income and expenditures on a yearly basis.

"If the budget is viewed simply as a technique for achieving an annual balance of income and expenditures, then there is no reason to object to any legislation requiring that the Governor's

budget for a coming year provide for a certain expenditure. The directive in no way disturbs the balance of income and outgo for the current or the ensuing year, and the General Assembly is not disrupting the control furnished by the budget mechanism. Thus, [the lower court's] suggestion that permitting the Legislature to mandate an item in a future gubernatorial budget bill is permitting it to do indirectly what it cannot do directly (*i.e.*, pass a supplementary appropriation bill calling for expenditures in the same fiscal year covered by the Governor's budget plan without raising the revenue to pay them) is inapt."

\* \* \*

"A reading of the complete report of the Goodnow Commission makes it clear that the primary purpose and aim of the Budget Amendment which that report proposed was to prevent a budget deficit; in other words, in the planning of state finances, to make certain that income matched outgo on a yearly basis. . . .

"Allowing the General Assembly, by enactment of a general state law, to require the Governor to include and to fund in a subsequent budget an appropriation for the purposes of that law in no way contravenes this objective. On the contrary, it accommodates the need for a balanced budget while, at the same time, it protects the power of the Legislature as the ultimate law-making and policy-determining body in our state government. The Governor still has the power, within the guidelines established by the General Assembly by law, to allocate the general revenues of the state among the various programs provided by law and to determine the extent to which these programs shall be funded. If in his opinion the general revenues of the state will not be sufficient, then it

> is incumbent upon him to make this fact known to
> the Legislature so that it may levy such taxes as it
> deems best to provide the necessary revenue."

Amicus further points out that it is not necessary to rely upon a general understanding of the intent and purposes of the Budget Amendment to support the power of the General Assembly to provide by law for mandated items. That power, it says, is spelled out explicitly in subsection (4) of the Budget Amendment which establishes "mandatory budget items," each of which is of equal dignity, force and viability. Amicus urges that the requirement of subsection (4) (g) that the Governor's budget contain an estimate of all appropriations "for such other purposes as are set forth in the . . . laws of the State" has precisely the same force and effect on the Governor in preparing the Budget Bill as does each of items (a), (b), (c), (d), (e) and (f). In this connection, the report of the Goodnow Commission which drafted the Budget Amendment includes this language:

> "Our first thought in drafting the proposed
> amendment has been: First — To impose upon the
> Governor the sole responsibility, *within the* limits
> of the Constitution and the *provisions of existing
> law,* of presenting to the Legislature a complete and
> comprehensive statement of the needs and
> resources of the State based upon: (a) Estimates
> made by those applying for State moneys; (b)
> Evidence brought out at public hearings on those
> estimates; and (c) Administrative revision by the
> Governor of all estimates, *except those* for the
> Legislature and the judiciary, and *for purposes
> for which provision has been made by* the
> Constitution or *existing law.*" Dept. of Legislative
> Reference, *The Maryland Budget Amendment* 12
> (1917) (Emphasis added.)

It is also to be noted that Maryland Code (1957, 1967 Repl. Vol.) Art. 15A, § 21A provides that "[I]n the preparation and submission of the budget bill and of any supplements thereto, . . . the Governor shall not change the language or

provisions of this Code or of other statutory law of this State." As to this, the amicus brief states:

"[O]nce Chapter 867 was duly passed and signed by the Governor, it became a valid statutory direction binding on the Governor. The specific language of the Budget Amendment, and *Code*, Article 15A, §21A, require compliance with the provisions of Chapter 867 by the Governor and other members of the executive branch in the preparation and submission of the state budget and the annual budget bill.

"In 1968, the Attorney General expressed his opinion that the Budget Amendment and *Code*, Article 15A, §21A would require the Governor to include an appropriation in the annual budget where a state law called for such an appropriation. 53 O.A.G. 95. In issue were certain laws providing for scholarships. In cases where those laws specifically provided that funds 'shall be placed [or included] in the budget from year to year', the opinion concluded, 'there is no room for discretion, and the Governor must include [funds to cover the scholarships] in his budget as mandatory appropriations.' (p. 96)

"Similar reasoning was applied in another 1968 opinion of the Attorney General, where, although it was concluded that the act creating the Maryland Hospital Commission did not direct an expenditure of funds and therefore could not be construed as a legislative mandate to the Governor to provide funds for the Commission in his annual budget, it is nevertheless clear that the Attorney General would have concluded that compliance by the Governor would have been required (under *Constitution*, Article III, §52 (4) (g) and *Code*, Article 15A, §21A) had the language of the statute constituted a legislative mandate. In arriving at his conclusion, the Attorney General pointed out that the act

creating the Hospital Commission provided that its members should serve without pay and that it should have 'such staff, officers and employees as may be provided for in the Budget from time to time', thus clearly leaving the matter of funding to the Governor's discretion. 53 O.A.G. 90.

"The Attorney General reached the same conclusion, *i.e.*, that in preparing his annual budget, the Governor must comply with valid legislative enactments, in an even more recent opinion dated May 28, 1974 .... 59 O.A.G. 64. Despite the unmistakable conclusion there reached, that Senate Bill 424 of the 1974 session, which called for appropriations in the Governor's budget in amounts 'not to exceed' $150,000 and $100,000 to provide certain scholarships, was not an appropriation and therefore not required to comply with subsection 8 of the Budget Amendment, the Attorney General stated his opinion that 'some kind of scholarship program is required to be developed *and* funded through the State Budget' (p. 65, emphasis in original; *see also* p. 69)."

\* \* \*

"In the case at bar, Chapter 867 was and is a clear direction to the Governor to implement its requirements in the appropriation to the Department of Human Resources in his annual budget. The mandate is as clear as if Chapter 867 had stated expressly, 'The Governor shall include in his annual budget an appropriation to the Department of Human Resources to cover payments to foster parents at a rate not less than that paid by the Department of Juvenile Services'. Unless the Governor made the mandated appropriation (one for a purpose as set forth in the laws of the state within the meaning of *Constitution*, Article III, § 52(4) (g)), he would be changing the provisions of Chapter 867, a duly

enacted state law, a result impermissible under *Code*, Article 15A, § 21A."

I think the short of it is that the Governor's failure to fund the provisions of Chapter 867 was plainly violative of the Constitution of Maryland and of Code, Art. 15A, § 21A. I would therefore reverse the judgment of the lower court.

Judges Smith and Digges authorize me to state that they concur in the views expressed in this dissent.

*Smith, J., dissenting:*

I concur fully in the dissenting opinion of Chief Judge Murphy. I would add but a few additional observations.

The constitutional provisions here under discussion are essentially the same as those proposed by the Constitutional Convention of Maryland in 1968. *See Comparison of Present Constitution and Constitution Proposed by Convention* 198-99 (1968). I find interesting and persuasive the views expressed at the Constitutional Convention on this subject by Delegates Joseph Sherbow and William S. James.

Delegate Sherbow is one of the acknowledged fiscal experts of this State, having served in 1939 as secretary of the Maryland Commission on Taxation and Revenues and in 1946 as chairman of the Commission on Distribution of Tax Revenues. At the Convention he was chairman of the Committee on State Finance and Taxation. As that committee chairman on December 6, 1967, he presented Committee Recommendation No. SF-5 to the Convention sitting as the Committee of the Whole. It concerned the budget. *See Journal of the Constitutional Convention of Maryland of 1967-68* 301 (1968). It was the practice of the Constitutional Convention for the chairman of each committee presenting such a recommendation to make comments relative to the proposal and then to subject himself to questions. I find instructive two sets of questions and answers:

"DELEGATE BENNETT: Well, it leaves a tremendous amount of power in the head of the budget system here. He is a practical dictator.

"I know from having dealt with budget directors in other places and it is pretty frustrating on the administrative officer not to have some appeal to the legislature.

"Is there any way, or would you object to any way by which a proviso could be put in which would allow, or prohibit the governor from reducing an appropriation or excluding an appropriation specifically provided for by a special bill?

"DELEGATE SHERBOW: If that is the law which is already in effect, he has to provide for it. But he can't anticipate a bill that may be passed, except to the extent that in the supplementary appropriation he can provide for it. But if you are talking about a law that has been passed which he may despise and have no use for, he has to include that in the budget. To prohibit a law yet to be passed, he couldn't possibly know what is required.

"We have these safeguards for which I am thankful." Transcript of Proceedings of Constitutional Convention pp. 7504-05.

"DELEGATE RALEY: Judge Sherbow, following along the question directed to you by Delegate Bennett and in regard to section 6.10, supplementary appropriations, I think we ought to get into the record where under section 6.10, supplementary appropriations, it says they shall be — there shall be a tax accompanying the action, that this — is it true; you can comment on it — that this does not prohibit the legislature from, say, passing a program for, say, mental health, without a tax, and it not going in effect in this coming budget year, but the next fiscal year the governor would then have to fund it?

"DELEGATE SHERBOW: Yes. What would happen would be if you provide it go into effect in the next fiscal year, it would have to be a part of the budget. He is required by law to, or by this Constitution to provide in his budget for that

particular program, and it is then an ordinary part of the program. But it is off, of course, for over a year." Transcript pp. 7514-15.

At another point on that same day a proposal was before the Convention which would have amended the recommendation of the Committee on State Finance and Taxation by permitting the General Assembly to "amend the budget bill by increasing or decreasing the appropriation for any item included in the budget, by transferring funds among items included in the budget or by including items not in the budget bill as introduced," so long as "[t]he total appropriation included in the budget bill as enacted by the General Assembly [did] not exceed the estimate of revenues submitted by the governor." *See Journal* at 302. Delegate James took the floor in opposition to this proposal. He was then President of the Senate of Maryland and is now State Treasurer. He said:

"DELEGATE JAMES: Mr. Chairman, Fellow Delegates:

"I would like to say that I have been in the General Assembly 21 years, and I have yet to talk to a responsible legislative leader, I have yet to talk to a legislator, who is not satisfied with the present executive budget system which limits the power of the General Assembly to cutting items.

"The legislature is certainly not helpless. If there is a public program which demands attention, the legislature studies this program, sometimes by itself, sometimes in cooperation with the governor; then plans are laid to adopt a program which expresses the legislative feeling in the matter, and if the program is adopted it is implemented in the executive budget. Let's face it. This is the proposal to implement expanding programs in a disorderly manner.

"I am confident the General Assembly and its members, by an overwhelming majority, are

opposed to this, and I urge you to adopt the conservative approach, the present system, which is orderly and does not lead us into the chaos that exists in the federal government and in many States which do not have Maryland's beneficial and orderly system of handling finances." Transcript pp. 7635-36.

These statements must be placed in the context that the delegates present included former Governor J. Millard Tawes; former Speaker of the House of Delegates of Maryland, Attorney General, and Judge of this Court, C. Ferdinand Sybert; a number of then legislators and former legislators; at least one highly respected then sitting circuit judge; retired judges including William L. Henderson, a former Chief Judge of this Court; and such a fiscal expert as Richard W. Case, Esq., vice-chairman of the committee of which Judge Sherbow was chairman. No delegate took issue with the accuracy of the statements made.

I am authorized by Chief Judge Murphy and Judge Digges to say that they concur in the views here expressed.