62 A.3d 265

**MUNICIPAL AND COUNTY GOVERNMENT
EMPLOYEES ORGANIZATION**

v.

**MONTGOMERY COUNTY EXECUTIVE.**

No. 0825, Sept. Term, 2011.

Court of Special Appeals of Maryland.

March 4, 2013.

164

Carey R. Butsavage (John Durkalski, Butsavage & Associates, PC, on the brief) Washington, DC, for appellant.

Edward B. Lattner, Chief (Marc P. Hansen, Co. Atty., on the brief) Rockville, MD, for appellee.

Panel: WRIGHT, HOTTEN, JAMES R. EYLER (Retired, Specially Assigned), JJ.

WRIGHT, J.

This appeal arises from appellee, Montgomery County Executive Isiah Leggett's ("County Executive"), failure to include sufficient funds to implement a collective bargaining agreement ("CBA") between Montgomery County and the appellant, United Food and Commercial Workers, Local 1994, Municipal and County Government Employees Organization (the "Union"), in the proposed budget for Fiscal Year 2012 ("FY12"). The Union filed a prohibited practice charge against the County Executive accusing him of violating §§ 33–109(a)(8) of the Montgomery County Code ("MCC"). On May 14, 2011, the Montgomery County Labor Relations Administrator ("LRA") issued a decision finding that the County Executive committed a prohibited practice by failing to submit an impasse arbitrator's award as part of his proposed budget.

The County filed a writ of mandamus in the Circuit Court for Montgomery County seeking judicial review of the LRA's decision. The circuit court reversed the LRA and this timely appeal followed.

### Question Presented

The Union ask us to determine:

Whether the Labor Relations Administrator for Montgomery County, Maryland correctly applied the Montgomery County Charter and Code when he held that the Montgomery County Executive committed a prohibited practice by refusing to submit an impasse arbitrator's award as part of his annual budget submission to the Montgomery County Council and ordered the Montgomery County Executive to specifically perform his obligations under the County Code.

Finding that the LRA's decision was based on a correct interpretation of the law, we reverse the circuit court's judgment.

### Facts and Procedural History

The facts in this case are undisputed. The Union and the County had a series of CBAs with the most current agreement set to expire on July 1, 2011. Consequently, the Union and the County Executive commenced bargaining for a new CBA in the Fall of 2010 and reached an impasse on certain economic issues in February 2011. Upon reaching an impasse, the parties submitted the dispute to an impasse arbitrator (the "Arbitrator"). The parties were required by the MCC to submit their last, best, final offers ("LBFO") to the Arbitrator, for the Arbitrator to review and decide which LBFO was the most reasonable. In making a conclusion, the Arbitrator was regulated by MCC § 33–108(f), which stated the following:

(4) In making a determination under this subsection, the mediator/arbitrator must first evaluate and give the highest priority to the ability of the County to pay for additional short-term and long-term expenditures by considering:

(A) the limits on the County's ability to raise taxes under State law and the County Charter;

(B) the added burden on County taxpayers, if any, resulting from increases in revenues needed to fund a final offer; and

(C) the County's ability to continue to provide the current standard of all public services.

(5) After evaluating the ability of the County to pay under paragraph (4), the mediator/arbitrator may only consider:

(A) the interest and welfare of County taxpayers and service recipients;

(B) past collective bargaining agreements between the parties, including the past bargaining history that led to each agreement;

(C) a comparison of wages, hours, benefits and conditions of employment of similar employees of other public employers in the Washington Metropolitan Area and in Maryland;

(D) a comparison of wages, hours, benefits, and conditions of employment of other Montgomery County employees; and

(E) wages, benefits, hours, and other working conditions of similar employees of private employers in Montgomery County.

On February 18–19, 2011, the Arbitrator held a hearing and both parties submitted evidence and presented witnesses. Following the hearing, the parties submitted briefs to the Arbitrator. On March 28, 2011, the Arbitrator issued an award finding that the Union's LBFO was the more reasonable offer. Under MCC § 33–108(f)(6), the LBFO selected by the Arbitrator became the final agreement between the parties ("2011 Agreement").[1] MCC § 33–108(g) then states:

---

1. MCC § 33–108(f)(6) states:

The offer selected by the mediator/arbitrator, integrated with all previously agreed on items, is the final agreement between the employer and the certified representative, need not be ratified by any party, and has the effect of a contract ratified by the parties under subsection (c). The parties **must** execute the agreement, **and any provision which requires action in the County budget must be**

In each proposed annual operating budget, the County Executive must describe any collective bargaining agreement or amendment to an agreement that is scheduled to take effect in the next fiscal year and estimate the cost of implementing that agreement. The employer must submit to the Council by April 1, unless extenuating circumstances require a later date, any term or condition of the collective bargaining agreement that requires an appropriation of funds, or the enactment or adoption of any County law or regulation, or which has or may have a present or future fiscal impact. If a later submission is necessary, the employer must specify the submission date and the reasons for delay to the Council President by April 1. The employer must expressly identify to the Council and the certified representative any term or condition that requires Council review. Each submission to the Council must include:

(1) all proposed legislation and regulations necessary to implement the collective bargaining agreement;

(2) all changes from the previous collective bargaining agreement, indicated by brackets and underlines or a similar notation system; and

(3) all side letters or other extraneous documents that are binding on the parties.

The employer must make a good faith effort to have the Council approve all terms of the final agreement that require Council review.

On March 15, 2011, the date required for budget submission by § 303 of the Montgomery County Charter ("Charter"), the County Executive submitted a proposed budget ("FY12 Budget") to the Council that did not include the Union's LBFO and sufficient funding to implement the 2011 Agreement, but instead included the County Executive's LBFO, which had been rejected by the Arbitrator. The County Executive's FY12 Budget admitted that "[t]his budget recommendation is

---

**included in the budget** which the employer submits to the County Council.
(Emphasis added).

inconsistent with the arbitrated award." The Union filed a petition in the circuit court to compel the County Executive to submit the Arbitrator's award as part of the FY12 Budget. The circuit court held that the Union's petition was premature because the Union was required to seek administrative relief first. To comply with the court's instruction, the Union filed prohibited practice charges with the LRA. The parties submitted briefs to the LRA and agreed to allow the LRA to decide the case without a hearing.

On May 14, 2011, the LRA issued a decision finding that the County Executive's actions constituted a prohibited practice under MCC § 33–109(a)(8), which states that it is a prohibited practice for the employer to "[d]irectly or indirectly oppos[e] the appropriation of funds or the enactment of legislation by the county council to implement an agreement reached between the employer and the certified representative under this article." The LRA found that the Charter permits the Council to limit the County Executive's budgetary discretion by requiring the County Executive, by statute, to include an impasse arbitrator's award in the proposed budget. In his decision, the LRA stated:

> Since the County has admitted that County Executive did not include in his recent budget the interest arbitration award and it's [sic] funding, the LRA finds that the County Executive did commit a prohibited practice as charged by the Union. However, if the County Executive's newly claimed discretion, to decide what his budget will contain, is determined to be valid, no Prohibited Practice will be found. That being the case, this discussion will turn to the legal questions upon which the briefs focused.

> This case presents a number of intriguing questions, which were not answered in the briefs, and which cause puzzlement and invite speculation. Here are just a few such questions:

> 1. When did a County lawyer first realize that Charter 303 offered the opportunity for the County Executive to free himself of the requirement of the collective bargain-

ing law on what must be included in his budget submission?

2. Was the County Executive immediately told he had established a poor practice by following the several collective bargaining laws in regard to what he must place in his budget?

3. Did anyone assess the harm using this previously unknown discretion might have on the long established relationship with the several unions?

4. How is it possible that when amendments were made over the years to the County Charter, particularly those related to collective bargaining or to State or County laws, that no one discovered this conflict between the Charter and the collective bargaining laws?

5. Doesn't the County have lawyers for both the Council and the Executive who should check on the language in proposed changes to the Charter and legislation to avoid such conflicts?

6. Has the decades-long practice by both the Union and County of following the collective bargaining law regarding what must be included in the County Executive's budget created a "past practice" which, as it would in private sector arbitration, make the formal rule inoperative? The LRA understands there is a difference between a law and a collective bargaining agreement. The parties are free to modify a CBA by practice.

On May 16, 2011, the County petitioned the circuit court for administrative mandamus to reverse the LRA's award. On June 7, 2011, the circuit court, in an oral opinion, granted the County's petition and reversed the decision of the LRA. The order was entered on June 10, 2011. On June 23, 2011, the Union noted this appeal.

Additional facts will be discussed in the relevant sections below.

## Standard of Review

■■■ The parties urge us to apply the usual standard of review of administrative agency decisions. Under this standard, the appellate court's role is identical to that of the circuit court, and we review the agency, or in this case, the LRA's decision. *Long Green Valley Ass'n v. Prigel Family Creamery,* 206 Md.App. 264, 273–74, 47 A.3d 1087 (2012); *Frey v. Comptroller of Treasury,* 422 Md. 111, 137–38, 29 A.3d 475 (2011), *cert. denied,* — U.S. ——, 132 S.Ct. 1796, 182 L.Ed.2d 618 (2012). As such, our review is limited to determining if the agency's factual findings are supported by substantial evidence and "no error of law exists." *Id.* The agency's legal conclusions are reviewed *de novo.*

■■■ Generally, we accord some deference to the agency when it is interpreting the statutes it administers. *Md. Aviation Admin. v. Noland,* 386 Md. 556, 572, 873 A.2d 1145 (2005). However, where the issue lies not with the collective bargaining statutes themselves, but with an interpretation of the Charter and the Council's ability to limit the County Executive's budgetary discretion, no deference is required.

## Discussion

### I. Collective Bargaining Law and Montgomery County Charter

■■■ The Union argues that the LRA properly concluded that the County Executive violated the MCC sections pertaining to collective bargaining with the Union by failing to include the Arbitrator's award as "**part** of the budget." (Emphasis in original). The Union contends that the collective bargaining laws unequivocally require the County Executive to include an arbitrator's award as part of the proposed budget because the award requires fiscal action to fund the CBA. According to the Union, it is insufficient for the County Executive "to simply submit the award for the Council's review or to submit a description of the award for the Council's consideration." The Union argues that the County Executive does not have "unlimited 'legislative' discretion when

participating in budgetary matters" because the Charter limits that discretion.

The County responds that the County Executive has a "virtually unchecked" discretionary legislative function in proposing a budget delegated to him by Charter § 303 that cannot be divested by any collective bargaining laws enacted by the County Council. The County asserts that the Charter "permits the Council to prescribe by law what information—as opposed to recommendations—the County Executive must include in the recommended budget." The County avers that the term "recommendation" refers to a "discretionary act calling for the exercise of judgment" in contrast to "a requirement to provide information, which is a ministerial function." The County also argues that a prohibited practice charge cannot arise out of the County Executive's "expression of his views," and that the County Executive "cannot be called to account before an arbitrator for an exercise of his legislative discretion."

Ultimately, the dispute involves the interpretation of the Charter and any effect the collective bargaining laws enacted by the Council has on the County Executive's responsibilities under Charter § 303. The Court of Appeals, after noting that "[t]he tension between public employee unions and local governments, particularly those bound by an executive budget system, has surfaced in Maryland appellate cases since at least [1945]," provided an extensive review of the cases arising since then in the recent opinion in *Atkinson v. Anne Arundel Cnty.*, 428 Md. 723, 728, 53 A.3d 1184 (2012). After an exhaustive discussion, the Court concluded that collective bargaining is appropriate charter material, and a county can impose binding arbitration on the executive branch.[2] *Id.* at 743–45, 53 A.3d 1184. There is no need to reiterate their

---

2. It is important to note that in *Atkinson*, the Anne Arundel County Charter required that an arbitrator's "binding decision be implemented as part of the following year's budget process" and did not leave room for the Council to enact legislation defining the limits and applicability of arbitration, as does Charter § 511. 428 Md. at 743, 53 A.3d 1184.

thorough analysis here, in response to the parties' arguments, that binding arbitration cannot apply to the County Executive.

## A. The State Executive Budget System

The Montgomery County budget system is modeled in many respects on the State budget system. The State has an "executive" budget system, where the budget originates with the Governor. So too, does Montgomery County—as the County points out, "[u]nder the Charter, only the County Executive can initiate the County's budgetary process." However, where the State system limits the ability of the General Assembly to alter the budget submitted to it,[3] the Montgomery County system gives the Council unfettered authority to alter, reduce, or increase the appropriations submitted by the Executive.[4] The similarities of the two systems, in regard to the limitations placed on the executive branch's discretion as to what must be included in the budget is instructive.

The State budget process is set forth in Art. III, § 52 of the Maryland Constitution. Section 52 was adopted, in large measure, to correct the haphazard system of appropriation

---

**3.** Art. III, § 52(6) states:

The General Assembly shall not amend the Budget Bill so as to affect either the obligations of the State under Section 34 of Article III of the Constitution, or the provisions made by the laws of the State for the establishment and maintenance of a system of public schools or the payment of any salaries required to be paid by the State of Maryland by the Constitution thereof; and the General Assembly may amend the bill by increasing or diminishing the items therein relating to the General Assembly, and by increasing or diminishing the items therein relating to the judiciary, but except as hereinbefore specified, may not alter the said bill except to strike out or reduce items therein, provided, however, that the salary or compensation of any public officer shall not be decreased during his term of office; and such bill, when and as passed by both Houses, shall be a law immediately without further action by the Governor.

**4.** Montgomery County Charter § 305 states in pertinent part: "The Council may add to, delete from, increase or decrease any appropriation item in the operating or capital budget. The Council shall approve each budget, as amended, and appropriate the funds therefor not later than June 1 of the year in which it is submitted."

that existed prior to 1915, which could easily lead to a deficit.[5] *See McKeldin v. Steedman,* 203 Md. 89, 96, 98 A.2d 561 (1953) ("Appropriations for various purposes were made piece-meal by the General Assembly, each project receiving independent consideration without relation to other claims upon the public purse."). Section 52 apportioned responsibility according to the established branches of government by vesting "sole responsibility, within the limits of the Constitution and the provisions of existing law, of presenting to the Legislature a complete and comprehensive statement of the needs and resources of the State" to the Governor. *Md. Action for Foster Children, Inc. v. State,* 279 Md. 133, 146, 367 A.2d 491 (1977)

---

**5.** The old system was described thusly:

It was customary, under the former method, for the Governor to appear in person before a joint meeting of the members of the House of Delegates and the Senate, at the beginning of every regular session of the Legislature, and to address them on "the condition of the State[,"]—in the course of which he was expected to direct their attention to the essential needs of the State, and to specifically recommend to their consideration such measures as he judged necessary. Having thus discharged the responsibility imposed upon him by the Constitution, the Governor must thereafter await the final disposition of his recommendations by the Legislature, whose members were free to adopt, alter or entirely ignore any or all of them, except in so far as the Governor, by virtue of his prestige and his influence with the members of the Legislature, might affect the course of his recommendations through the Legislature.

\*     \*     \*

The power to fix the fiscal policies and determine the course of the fiscal operations of the State was, therefore, exclusively vested in the Legislature, subject only to the mild restraint of the limited veto powers of the Governor, and whatever power of persuasion he might be capable of exercising with individual members of the Legislature. The old method often witnessed "log-rolling" or "you help me and I'll help you" tactics among many of the members of the Legislature in their efforts to insure passage of the particular appropriations in which they had some selfish or political interest. It was not unusual for excessive appropriations to result from such tactics and also from the pressure of political and professional lobbyists; and, almost as frequently, some of the most important activities or needs of the State were either overlooked or sadly neglected in what was commonly termed, the "Pork Barrel" scramble.

*Panitz v. Comptroller of Treasury,* 247 Md. 501, 505–506, 232 A.2d 891 (1967) (quoting Hooper S. Miles, *The Maryland Executive Budget System* 8–9 (1942)).

(quoting *Journal of Proceedings of the Senate of Maryland* at 133–34). The General Assembly was given authority to initiate appropriations, but was subject to the balanced budget requirement of Art. III, § 52. The underlying purpose of establishing an orderly budget system with clearly delineated responsibility was the rationale behind the Court's holding in *Foster Children*, where it stated:

> The provisions of the Budget Amendment to the Maryland Constitution, Art. III, § 52, and the purposes underlying those provisions set forth in the Goodnow Commission's report, compel the conclusion that he funding of Art. 88A, § 60B(b) of the Code in future annual budgets is a matter constitutionally committed to the Governor's discretion. For a court to require that the Governor fund the foster care program administered by the Juvenile Services Administration at a particular level in future Budgets prepared and submitted by the Governor would be inconsistent with several provisions of the Budget Amendment to the Constitution.

*Id.* at 148, 367 A.2d 491.

The Court further explained: "The Legislature, by enacting statutes specifying minimum spending limits, cannot deprive the Governor of the discretion which the Constitution explicitly vests in him." *Id.* at 151, 367 A.2d 491. The Court stated that if the General Assembly could specify what was to be included in the budget and the amounts, then the executive budget system would be destroyed. *Id.* at 152, 367 A.2d 491.

Dissenting, Chief Judge Murphy stated:

> To impose such a mandatory duty on the Governor is not to cause the destruction of the executive budget system, as the majority suggests. Indeed, not to impose such a duty upon the Governor has far more deadly consequences; most certainly it would herald the demise of the delicate and time-honored balance existing between the power and responsibility of the legislature to make the laws and the Governor's duty to see that they are faithfully executed. . . .
> Under the majority's interpretation, the Governor enjoys

unbridled authority to ignore the legislative will, or even worse, to decide, in his sole discretion, which enactments will be funded and which will not.

*Id.* at 153, 367 A.2d 491. The dissent pointed to the language of Art. III, § 52(4) requiring the Governor to include appropriations "for such other purposes as are set forth in the . . . laws of the State" and argues that this provision removes the Governor's discretion to simply exclude items from the budget. *Id.* at 157, 367 A.2d 491. The dissent explains that it is not "new or novel" for the General Assembly "by enacting a general law [to] compel the Governor to include an appropriation in his Budget Bill[.]" *Id.* at 158, 367 A.2d 491 (citations omitted); *see also id.* at 160–61, 367 A.2d 491 (citing the Goodnow Commission which drafted the Budget Amendment and Md.Code (1957, 1967 Repl.Vol.) Art. 15A, § 21A). Citing to amicus curiae briefs, the dissent clarified the position of the General Assembly:

Maryland's adoption of an executive budget system has resulted in no transfer from the General Assembly of its fundamental power to declare what the law shall be, in fiscal as in other matters. At most, the adoption of such a system shifted to the Governor a role of initiation or proposal; it did not give to the executive branch any power to overrule legislative policy determinations.

\*     \*     \*

The Governor still has the power, within the guidelines established by the General Assembly by law, to allocate the general revenues of the state among the various programs provided by law and to determine the extent to which these programs shall be funded. If in his opinion the general revenues of the state will not be sufficient, then it is incumbent upon him to make this fact known to the Legislature so that it may levy such taxes as it deems best to provide the necessary revenue.

*Id.* at 158–160, 367 A.2d 491.

The majority's holding was superceded in part by a 1978 constitutional amendment, which required the Governor to

include in the annual budget bill any minimum level of funding for a program specified by statute. It is our view that, as a result, the dissent's argument has been vindicated and, as the County Executive analogizes his role to that of the Governor, this discussion is pertinent to the case *sub judice*. Further, because the question of whether the Council can permissibly constrain the County Executive's discretion in his budget submission is one of first impression, we will be guided by the State's example.

## B. History of the Montgomery County Charter

Montgomery County evolved differently than the State, with the position of the County Executive established via an amendment to the County's original Charter. Montgomery County is a "home rule" county, authorized by Article XI–A of the Maryland Constitution to adopt a county charter. The county charter functions as a "constitution" for the county. *Mont. Cnty. v. Anchor Inn Seafood Rest.*, 374 Md. 327, 331, 822 A.2d 429 (2003) (citing *Save Our Streets v. Mitchell*, 357 Md. 237, 248, 743 A.2d 748 (2000)). Article XI–A, § 3, requires "that a county adopting a home rule charter must select one of two types of government: (1) an elective legislative body known as the County Council without an elected County Executive or (2) an elective County Council plus an elective County Executive." *Id.* at 331, 822 A.2d 429 (footnote omitted); *see* Md. Const. Art. XI–A, § 3.

In 1948, Montgomery County adopted a charter. In the original charter, Montgomery County had no county executive, making the elected County Council the entire governing body with both legislative and executive powers. *Id.* at 332, 822 A.2d 429. Twenty years later, in 1968, Montgomery County adopted a new charter, effective in 1970, which, pursuant to Article XI–A, imposed separation of powers with the Council as the legislative branch and a county executive as the executive branch of the government. *Id.; see also Eggert v. Mont. Cnty. Council,* 263 Md. 243, 256–60, 282 A.2d 474 (1971) (discussing the new charter and how the Council's efforts to

exercise powers now reserved to the executive branch were invalid).

The original Charter expressly prohibited the Council, when sitting in executive session from exercising legislative powers. *Scull v. Mont. Citizens League,* 249 Md. 271, 280, 239 A.2d 92 (1968). In construing the Council's powers respective roles, the Court in *Scull* stated that "unambiguously ... the Council in executive session has and may exercise the administrative and executive powers ... and may implement and facilitate and insure the proper execution of laws and ordinances passed by the Council in legislative session[.]" *Id.* at 281–82, 239 A.2d 92. This same delineation of power is reflected in the new (and current) Charter.

Article 1 of the Charter describes the legislative branch of the county, with § 101 stating, in pertinent part:

All legislative powers which may be exercised by Montgomery County under the Constitution and laws of Maryland, including all law making powers heretofore exercised by the General Assembly of Maryland but transferred to the people of the County by virtue of the adoption of this Charter, and the legislative powers vested in the County Commissioners as a District Council for the Montgomery County Suburban District, shall be vested in the County Council. The legislative power shall also include, but not be limited to, the power to enact public local laws for the County and repeal or amend local laws for the County heretofore enacted by the General Assembly upon the matters covered by Article 25A, Annotated Code of Maryland, 1957, as now in force or hereafter amended, and the power to legislate for the peace, good government, health, safety or welfare of the County.

Article 2 of the Charter sets forth the executive branch powers, stating in § 201:

The executive power vested in Montgomery County by the Constitution and laws of Maryland and by this Charter shall be vested in a County Executive who shall be the chief executive officer of Montgomery County and who shall

faithfully execute the laws. In such capacity, the County Executive shall be the elected executive officer mentioned in Article XI–A, Section 3 of the Constitution of Maryland. The County Executive shall have no legislative power except the power to make rules and regulations expressly delegated by a law enacted by the Council or by this Charter.

The Charter's delegation of power is critical to an analysis of the meaning of Charter § 303. Section 303 states:

The County Executive shall submit to the Council, not later than January 15 and March 15, respectively of each year, proposed capital and operating budgets including recommended expenditures and revenue sources for the ensuing fiscal year and any other information in such form and detail as the County Executive shall determine and as may be prescribed by law. These budgets shall be consistent with six-year programs. A summary shall be submitted with the budgets containing an analysis of the fiscal implications for the County of all available budgets of any agencies for which the Council sets tax rates, makes levies, approves programs or budgets.

As discussed, Charter § 305 gives the Council the authority to "add to, delete from, increase or decrease any appropriation item in the operating or capital budget." The Council clearly did not divest itself of authority to overhaul the budget submitted by the Executive in the way that the General Assembly is precluded from altering that submitted by the Governor. Section 511 states:

The Montgomery County Council may provide by law for collective bargaining, with arbitration or other impasse resolution procedures, with authorized representatives of officers and employees of the County Government not covered by either Section 510 or Section 510A of this Charter. Any law so enacted shall prohibit strikes or work stoppages for such officers and employees.

The Council enacted the collective bargaining laws at issue pursuant to Charter § 511 and imposed binding arbitration on the Executive, but not on itself. *See* footnote 6 and accompa-

nying text, *infra.* It is evident that the Council retained nearly all the discretion in enacting a budget, subject only to the Executive's line-item veto power.

## C. Statutory Interpretation

Recently, in *Mont. Cnty. v. Fraternal Order of Police, Mont. Cnty. Lodge 35, Inc.,* 427 Md. 561, 50 A.3d 579 (2012), the Court of Appeals reiterated the following regarding statutory interpretation:

> It is a well-settled principle that the primary objective of statutory interpretation is to ascertain and effectuate the intention of the legislature. The first step in this inquiry is to examine the plain language of the statute, and if the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written. Thus, where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself to determine legislative intent. Furthermore, words may not be added to, or removed from, an unambiguous statute in order to give it a meaning not reflected by the words the Legislature chose to use[.]

*Id.* at 572–73, 50 A.3d 579 (quoting *Dep't of Human Resources v. Hayward,* 426 Md. 638, 649–50, 45 A.3d 224 (2012) (internal citations and quotation marks omitted)). "Charters are subject to the same canons of statutory construction that apply to the interpretation of statutes." Just as the cardinal rule of statutory interpretation is to ascertain the intention of the legislature, so it is "the cardinal rule of charter interpretation." *Mayor & City Council v. Bunting,* 168 Md.App. 134, 141, 895 A.2d 1068 (2006) (internal citations and quotation marks omitted). The Court of Appeals has said:

> where a statute is plainly susceptible of more than one meaning and thus contains an ambiguity, courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment. In such circumstances, the

court, in seeking to ascertain legislative intent, may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.

*Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 75, 517 A.2d 730 (1986) (internal citations omitted).

Even under the plain meaning rule, however, we do not ignore the Legislature's purpose if it is readily known ... [and] may ... consider the particular problem or problems the Legislature was addressing, and the objectives it sought to attain.

*Maryland—Nat'l Capital Park & Planning Comm'n v. Anderson*, 164 Md.App. 540, 569–70, 884 A.2d 157 (2005) (internal citations omitted). "[W]e are obligated to construe the statute as a whole, so that all provisions are considered together and, to the extent possible, reconciled and harmonized." *Id.* at 570, 884 A.2d 157 (citations omitted). A statutory provision should be interpreted in the context of the entire statutory scheme, and reading the various provisions together and giving effect to each can aid in determining the intent of the legislature. *Office of the Pub. Defender*, 413 Md. 411, 464, 993 A.2d 55; *see Gordon Family P'ship v. Gar On Jer*, 348 Md. 129, 138, 702 A.2d 753 (1997).

Thus, we must view § 303 in context of the entire Charter. Section 302 of the Charter, entitled "Six Year Programs for Public Services, Capital Improvements, and Fiscal Policy," states:

The County Executive shall submit to the Council, not later than January 15 of each even-numbered year, a comprehensive six-year program for capital improvements. The County Executive shall submit to the Council, not later than March 15 of each year, comprehensive six-year programs for public services and fiscal policy. The six-year programs shall require a vote of at least five Councilmembers for approval or modification. Final Council approval of the six-

year programs shall occur at or about the date of budget approval.

The public services program shall include a statement of program objectives and recommend levels of public service by the County government, and shall provide an estimate of costs, a statement of revenue sources, and an estimate of the impact of the program on County revenues and the capital budget.

The capital improvements program shall include a statement of the objectives of capital programs and the relationship of capital programs to the County's long-range development plans; shall recommend capital projects and a construction schedule; and shall provide an estimate of costs, a statement of anticipated revenue sources, and an estimate of the impact of the program on County revenues and the operating budget. The capital improvements program **shall, to the extent authorized by law, include** all capital projects and programs of all agencies for which the County sets tax rates or approves budgets or programs. The Council may amend an approved capital improvements program at any time by an affirmative vote of six Councilmembers.

The fiscal program shall show projections of revenues and expenditures for all functions, recommend revenue and expenditure policies for the program period and analyze the impact of tax and expenditure patterns on public programs and the economy of the County.

**The County Executive shall provide such other information relating to these programs as may be prescribed by law.**

All capital improvement projects which are estimated to cost in excess of an amount to be established by law or which the County Council determines to possess unusual characteristics or to be of sufficient public importance shall be individually authorized by law; provided however, that any project declared by the County Council to be of an emergency nature necessary for the protection of the public health or safety shall not be subject to this requirement if

the project is approved by the affirmative vote of six Councilmembers. Any project mandated by law, statutory or otherwise, interstate compact, or any project required by law to serve two or more jurisdictions shall, likewise, not be subject to this requirement. The County Council **shall prescribe by law** the methods and procedures for implementation of this provision.

(Emphasis added).

Just as in Charter § 303, in the above-cited section of the Charter, the County Executive is required to include in the six-year plan any "other information . . . as may be prescribed by law." The Council may amend an approved capital improvement program at any time by an affirmative vote of six Councilmembers. Here, the Charter again reserves to the Council the authority to amend the County Executive's submissions. Section 303 requires the County Executive to make the budget consistent with these six-year programs, a clear limit on the County Executive's discretion.

The Council retains the authority to limit the County Executive's power through legislation in other Charter provisions as well. Section 217, entitled "Reorganization of the Executive Branch," states that "[t]he Council may prescribe **by law** the organization of the Executive Branch of County Government." (Emphasis added). Section 309, entitled "Transfer of Funds," permits the County Executive to "transfer an unencumbered appropriation balance within a division or between divisions of the same department" but allows the Council to limit that authority in stating that "[t]ransfers between departments, boards or commissions, or to any new account, shall be made only by the County Council upon the recommendation of the County Executive." Section 501, entitled "Disaster–Continuity of Government During Emergencies," states:

In order to ensure continuity of government during an emergency caused by a disaster or enemy attack, the Council shall prescribe **by law** for the temporary suspension of specific provisions of this Charter and for temporary succes-

sion to the powers and duties of public offices whether filled by election or appointment.

(Emphasis added). The Charter affords the Council the authority to control the County Executive's action or limit the County Executive's discretion by enacting laws specific to more general Charter provisions.

Moving on, the Charter provision in question, § 303, is not ambiguous. It requires the County Executive to include information "required by law" in the budget proposal. The County argues that the provision in dispute in § 303 should be read such that "other information . . . as may be prescribed by law" is separate from what must be included in the budget. We disagree. Parsing the sentence into its component parts results in the following:

> The County Executive shall submit to the Council, not later than January 15 and March 15, respectively of each year, proposed capital and operating budgets including [1] recommended expenditures and revenue sources for the ensuing fiscal year and [2] any other information in such form and detail [a] as the County Executive shall determine and [b] as may be prescribed by law.

The disputed provision requires that the County Executive "includ[e]" in the budget "information in such form and detail" that is "prescribed by law" in addition to information that he chooses to include in his discretion. "Other information" cannot be separated from "including" in the way that the County suggests.

Charter § 511 is also not ambiguous; it gives the Council the authority to enact collective bargaining laws with arbitration and impasse procedures if it so chooses, and which it has done. Those laws are binding on the County Executive as well as the employees to which they relate. If the County Executive, as the employer who is required to be bound by an arbitrator's decision, can effectively undo an arbitrator's decision by refusing to include any agreement in the budget proposal that requires appropriation, then an intractable conflict results. *See Atkinson,* 428 Md. at 748 n. 9, 53 A.3d 1184

(discussing that if the legislative body is required to have the "discretion to refuse to fund a binding arbitration award, then there can never be binding arbitration").

We are required by another canon of statutory construction to " 'avoid constructions that are illogical, unreasonable, or inconsistent with common sense.' " *Bunting*, 168 Md.App. at 142, 895 A.2d 1068 (quoting *Nesbit v. Gov't Emps. Ins. Co.*, 382 Md. 65, 75, 854 A.2d 879 (2004)). The *Bunting* Court stated by way of example that Montgomery County had used its code to "define the boundaries of what had been granted in [its] charter[ ]." *Id.* at 146, 895 A.2d 1068. Thus, the Council defined the boundaries of the County Executive's budgetary discretion granted generally in Charter § 303 as related to collective bargaining agreements in the MCC. Such an interpretation is consistent with Charter provisions that provide for the Council to supplement Charter requirements by enacting legislation.

The Court of Appeals explained that " 'if two statutes contain an irreconcilable conflict, the statute whose relevant substantive provisions were enacted most recently may impliedly repeal any conflicting provision of the earlier statute.' " *Atkinson*, 428 Md. at 743, 53 A.3d 1184 (quoting *State v. Harris*, 327 Md. 32, 39, 607 A.2d 552 (1992)). Moreover, "[w]hen ... two statutes conflict and one is general and the other specific, the statutes may be harmonized by viewing the more specific statute as an exception to the more general one." *Smack v. Dep't of Health & Mental Hygiene*, 378 Md. 298, 306, 835 A.2d 1175 (2003) (citations omitted). Here, the County Executive has discretion as to what to recommend in the budget pursuant to Charter § 303, except where otherwise constrained by the later-enacted § 511 and collective bargaining laws. Interpreting the phrase "as otherwise required by law" in § 303 to exclude the collective bargaining provisions of the MCC is to render those words meaningless. Such an interpretation violates the canon of statutory interpretation requiring that no word is rendered superfluous or meaningless and, as discussed, would require interpreting § 303 inconsistently with other provisions of the Charter. *Atkinson*, 428

Md. at 744–45, 53 A.3d 1184; *see also Office of Pub. Defender*, 413 Md. at 465, 993 A.2d 55.

An amendment to the Charter, such as § 511, "is necessarily limited in substance to amending the form or structure of government initially established by adoption of the charter." *Bunting*, 168 Md.App. at 147, 895 A.2d 1068 (citation omitted). Unlike the cases cited by the parties in which charter provisions were invalidated by virtue of being too specific, or in the nature of "legislative" schemes, the County's argument is that § 511 is not specific **enough** because it does not require the County Executive to include an arbitrator's award in the proposed budget. *See Griffith v. Wakefield*, 298 Md. 381, 470 A.2d 345 (1984); *Cheeks v. Cedlair Corp.*, 287 Md. 595, 415 A.2d 255 (1980); *Md. Classified Emps. Assoc. v. Anderson*, 281 Md. 496, 380 A.2d 1032 (1977); *Wicomico Cnty. Fraternal Order of Police v. Wicomico Cnty.*, 190 Md.App. 291, 988 A.2d 555 (2010).

We find this argument unpersuasive and contradicted by the Montgomery County Attorney's July 22, 1998 opinion that § 511, which allows for collective bargaining with arbitration or impasse procedures for County employees other than police and firefighters, permits the Council to delegate the County Executive's responsibilities to a third-party. In the memorandum from the Office of the County Attorney to the Council, the County Attorney expressed the view that "delegating the County Executive's decision-making authority with respect to a collective-bargaining agreement to a private arbitrator" would not "amount to an unlawful delegation of the executive power assigned to the County Executive by § 201 of the Charter" because Charter § 511 authorizes the Council to provide for such delegation through legislation. The July 22, 1998 memorandum states "[t]he legislative history concerning Charter § 511 confirms that § 511 was intended to authorize a binding dispute resolution process." The County Attorney concluded by stating:

> Unless authorized by the County Charter, the Council would be without the authority to enact legislation to impose a binding dispute-resolution process on the exercise of an

executive function—like agreeing to a collective bargaining agreement—by the County Executive. But Charter § 511 does authorize the Council to enact legislation providing for arbitration to resolve collective bargaining impasses.

The Court of Appeals has stated that "absent authorization from the county charter or State public general law, [a] local [collective bargaining] ordinance could not validly provide for the delegation to others of certain duties involving the exercise of discretion specifically assigned by a county charter to the county executive and council" such as the budget. *Fraternal Order of Police v. Baltimore Cnty.*, 340 Md. 157, 170, 665 A.2d 1029 (1995) (citing *Freeman v. Local 1802*, 318 Md. 684, 691, 569 A.2d 1244 (1990); *Anne Arundel Cnty. v. Fraternal Order*, 313 Md. 98, 543 A.2d 841 (1988); *Md. Cl. Emp. Ass'n., Inc. v. Anderson*, 281 Md. 496, 380 A.2d 1032 (1977)). The Court also stated:

> Where municipal governments have been authorized by higher law, *i.e.*, state constitutional provisions, or public general laws or municipal charter provisions, to enter into collective bargaining agreements which bind them in the exercise of their legislative discretion, the courts have generally upheld such collective bargaining agreements, rejecting contentions that they amount to invalid abdications or delegations of legislative authority. On the other hand, in the situation where neither a public general law nor municipal charter provision authorized the municipality to bind itself in the exercise of legislative discretion over public employee compensation, the courts have generally taken the position that attempts to do so in collective bargaining agreements or municipal ordinances are invalid.

*Anne Arundel Cnty.*, 313 Md. at 114–15, 543 A.2d 841 (quoting *Anderson*, 281 Md. at 508–09, 380 A.2d 1032). In the instant case, the Charter allows for such delegation because it both permits arbitration in § 511, and subjects the County Executive's budgetary discretion to limitation "as may be prescribed by law" in § 303. The *Atkinson* Court stated:

Once the voters ... made the policy decision [to have binding arbitration in the budget process], Charter § 812 left all of the detail of implementation to the Council for the exercise of its Art. XI–A, § 3 law-making power in Bill 1–03. It covered possible mediation, each step in the selection of the neutral arbitrator, timing, the powers of the arbitrator, receipt of final offers of each party, ten factors to be considered by the arbitrator after receiving evidence, the final, binding award, possible revision thereof by agreement, post-hearing motion or court action, and implementation of the award as part of the budget process. We hold that Charter § 812 did not unconstitutionally preclude the exercise of the County Council's law-making discretion.

428 Md. at 749–50, 53 A.3d 1184. Clearly, the Charter permits limits to budgetary discretion.

Requiring the County Executive to participate in the bargaining process but then allowing the County Executive to unilaterally refuse to include the results of that process in the proposed budget pursuant to MCC would foster uncertainty. No county employee would ever know the sincerity with which the County Executive was bargaining, or if the Council would be privy to any agreement reached between the County Executive and the Union. The Council considered the issues that the Charter raises—that the County Executive must consider the fiscal health of the county in submitting a budget—and created a detailed statutory scheme in which an arbitrator must consider several financial factors in determining which party's LBFO is the most reasonable. *See* MCC §§ 33–108(f)(4)–(5). The County Executive's argument, raised for the first time in its brief, that the County Executive must retain the ultimate discretion on what to include in the budget because of changes in the economy, ignores that the Council reserved for itself the ability to address such circumstances. The Council retained the ability to add or remove items from the proposed budget, including items in any CBA.[6]

---

6.  MCC § 33–108(i)–(j) states in pertinent part:

Similarly, the State has a collective bargaining law codified in Md.Code (1993, 2009 Repl.Vol.), § 3–501 of the State Personnel & Pensions Article ("SPP"), addressing collective bargaining with state employees. Subsection (c) states in pertinent part:

(1) The parties shall make every reasonable effort to conclude negotiations in a timely manner for inclusion by the principal unit in its budget request to the Governor.

*　　*　　*

(2)(ii) In the budget bill submitted to the General Assembly, the Governor **shall** include any amounts in the budgets of the principal units required to accommodate any additional cost resulting from the negotiations, including the actuarial impact of any legislative changes to any of the State pension or retirement systems that are required, as a result of the negotiations, for the fiscal year beginning the following July 1 if the legislative changes have been negotiated to become effective in that fiscal year.

(Emphasis added). Subsection (d) states, regarding a Memorandum of Understanding ("MOU"), which is the equivalent of a CBA and contains all the terms agreed upon during the negotiations: "(2) To the extent these matters require legislative approval or the appropriation of funds, the matters shall be recommended to the General Assembly for approval or for the appropriation of funds."

----

(i) The Council may accept or reject all or part of any term or condition that requires Council review under subsection (g).

*　　*　　*

(i) If the Council indicates its intention to reject any item that requires Council review, the Council must designate a representative to meet with the parties and present the Council's views in the parties' further negotiation on items that the Council has indicated its intention to reject. This representative must also participate fully in stating the Council's position in any ensuing impasse procedure.... The parties must submit the results of the negotiation, whether a complete or a partial agreement, to the Council on or before May 10.... The Council then must consider the agreement as renegotiated by the parties and indicate by resolution its intention to appropriate funds for or otherwise implement the agreement, or its intention not to do so.

The Maryland Constitution, unlike the Montgomery County Charter, has no provision expressly requiring collective bargaining or binding arbitration. Nevertheless, the Governor is required to include in his budget amounts necessary to fund any agreement. In *Ehrlich v. Md. State Emps. Union*, 382 Md. 597, 607–608, 856 A.2d 669 (2004), discussing why the Governor was required to sign the MOU or otherwise ratify it, the Court of Appeals stated:

> The statute, at least on its face, does purport to limit the Governor's discretion. Section 3–501(c)(2)(ii) requires that "in the budget bill submitted to the General Assembly, the Governor shall include any amounts in the budgets of the principal units required to accommodate any additional cost resulting from the negotiations...." Given that statutory mandate which, coupled with the Constitutional mandate of Art. III, § 52(4)(g) of the Maryland Constitution, would seem to require at least the incumbent Governor during whose term of office the MOU was signed to include appropriations to fund the MOU provisions, the Legislature obviously wanted to make certain that the Governor personally understood and approved what was in any MOU signed at his direction.

The State requirements are analogous to the situation in Montgomery County. The primary differences between the systems are the amount of control retained by the Council versus the General Assembly, the State collective bargaining provisions do not require binding arbitration or make an agreement reached through arbitration binding on both the employees and the Governor, and at the State level, the governor retains the discretion to ratify the MOU. It is settled that the Governor can be required by ordinary law enacted by the General Assembly to include specific items or funding in the budget. So too can the County Executive.

Additionally, the County's arguments that Charter § 510, 510A, and 511 did not put the public on notice that the Council would constrain the County Executive's discretion in preparing a budget as it pertains to collective bargaining are equally

unpersuasive. Charter § 111, entitled "Enactment of Legisla-tion," states:

> The Council shall enact legislation only after public hearing upon reasonable notice. No legislation shall be enacted by the Council unless it receives the affirmative vote of five members of the Council. Legislation containing a section declaring that it is necessary for the immediate protection of the public health, safety, or interest, and enacted by the affirmative vote of at least six members of the Council, shall be expedited legislation. Expedited legislation, as defined in this section, is the emergency legislation referred to in Article XI–A, Section 3, of the Constitution of Maryland. Any vote cast by a member on any legislation shall be recorded in the journal of the Council.

Thus, the provisions in the MCC requiring the County Execu-tive to submit to binding arbitration and to include the results of that arbitration in the budget were required by the Charter to be presented to the public. The Council could then act on the budget submission. In sum, we can find no persuasive authority supporting the County's position.

### D. Proposing the Budget is a "Legislative Act"

The County argues that the County Executive acts in a legislative capacity when submitting a budget proposal to the Council. The Union disagrees, and the Court of Appeals has rejected such an argument several times, stating:

> [W]e have an unbroken line of county authorities from the original Provincial county courts to the County Commission-ers at the present time, and continuing to a County Council, if one is established under a charter, all authorized to exercise the power of fixing the county expenditures and raising money to defray them. This is, therefore, not a new power conferred upon the counties by Article XI[-]A, but on the contrary is a power always previously exercised by some local agency in every county. It was not exercised, though it was authorized, by the General Assembly, and was not "legislation" in any ordinary sense in which the word is used.

*Schneider v. Lansdale,* 191 Md. 317, 325–26, 61 A.2d 671 (1948) (discussing the proposed Montgomery County charter and holding that "the budget and the appropriation and the tax levy are none of them 'legislation' as the word is used in [Article XI–A, § 3]"). The Court has stated that a test for determining if an action is legislative versus executive "is whether the [action] is one making new law—an enactment of general application prescribing a new plan or policy—or is one which merely looks to or facilitates the administration, execution or implementation of a law already in force and effect." *Scull,* 249 Md. at 282, 239 A.2d 92 (citations omitted). The Court clarified that a ministerial, rather than legislative action, is one that "is a duty that has been positively imposed by law, and its performance [is] required at a time and in a manner, or upon conditions which are specifically designated[;] . . . is absolute, certain, and imperative, involving merely the execution of a set task[;] . . . is inflexibly mandatory[; or is] . . . done by officers and employees who are required to . . . administer the law with little choice as to when, where, how or under what circumstances their acts are to be done." *D'Aoust v. Diamond,* 424 Md. 549, 588–89, 36 A.3d 941 (2012) (internal citations and quotations omitted).

The County cites us to several federal cases, including a recent case in which the Fourth Circuit stated that "enacting a budget is a legislative act." *Kensington Vol. Fire Dep't, Inc. v. Mont. Cnty.,* 684 F.3d 462, 471 (2012) (citations omitted). While we find this decision instructive, we are bound by the Court of Appeals precedent.[7]

In *Kensington,* Montgomery County volunteer fire and rescue departments ("VFRDs") brought suit against the County and the County Executive claiming that the County Executive reduced funding for VFRDs in retaliation for the VFRDs' opposition to legislation that attempted to impose a fee for ambulance service as a means of raising revenue for the

---

7. Even if submitting the budget as a whole is a legislative act, including the funding required by law to implement a CBA as an item in the budget is a ministerial act as described in *D'Aoust, supra.*

County. The U.S. District Court for the District of Maryland dismissed the suit, in part, on the ground that the County Executive was protected by legislative immunity and the individuals, who were not County employees,[8] could not bring an abusive discharge claim under Maryland law. The appellate court affirmed that dismissal.

The County Executive in *Kensington* submitted the budget cuts as part of a "budget savings plan" on October 5, 2010, "to address the potential loss of revenue" from the defeat of the ambulance bill. *Id.* at 466. The County Executive then proposed a second "savings plan" for FY11 in December 2010. The Council passed a revised FY11 budget with over $32 million in reductions from the budget that was originally enacted in May 2010. *Id.* at 465–66. In evaluating whether the County Executive and Montgomery County Fire Chief Richard Bowers, who supported the proposed cuts before the Council, were entitled to legislative immunity, the Court stated:

> Legislative acts, the ones for which the immunity and privilege are granted, typically involve the adoption of prospective, legislative-type rules, rules that establish a general policy affecting the larger population. They also generally bear the outward marks of public decisionmaking, including the observance of formal legislative procedures. By contrast, legislators' employment and personnel decisions are generally administrative acts because they most often affect specific individuals rather than formulate broad public policy.

*Id.* at 470–71 (quoting *EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 184 (4th Cir.2011)).

Applying this test, the *Kensington* Court had "no trouble concluding that enacting a budget is a legislative act." *Id.* at 471 (citing *Bogan v. Scott–Harris*, 523 U.S. 44, 55, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998) (finding that legislative acts can be

---

8. Each VFRD was an independent corporation under Maryland law with the County funding administrative support positions. *Kensington,* 684 F.3d at 465.

performed by an executive branch official)). The Court explained that the County Executive and Bowers were named as defendants "based on their legislative activity in proposing, submitting, and advocating for a budget" and were, therefore, entitled to legislative immunity from the tort claim. *Id.* at 471.

*Kensington* is distinguishable. It addresses a tort claim for discharge based on the County Executive advocating for budgetary reductions to a previously-enacted piece of legislation— the FY11 budget. It does not stand for the proposition that the inclusion of required information in a budget proposal constitutes a legislative, rather than a ministerial, act.

The County moves on to cite to cases that involve the General Assembly's delegation of appropriation authority to the Governor in further support of its argument that budget-making is a legislative function. These cases have only limited relevance to the case *sub judice* because, as discussed, "[t]he Montgomery County budget system differs from the type of executive budget systems in several other charter counties and at the state government level." *Haub v. Mont. Cnty.*, 353 Md. 448, 450, 727 A.2d 369 (1999) (holding that a complaint challenged a legislative act only **after** the Council had acted on the County Executive's budget submission). Nevertheless, even if the County Executive's acts could be construed as legislative, these cases support our conclusion that the Charter's limit of the County Executive's budgetary discretion was proper.

In *Judy v. Schaefer*, 331 Md. 239, 262, 627 A.2d 1039 (1993), the Court of Appeals explained that "Article III, § 52, allows the Governor to act in a way that would otherwise be considered legislative; the Governor has a major legislative-type role with respect to the budget." (Citing *Mandel v. O'Hara*, 320 Md. 103, 121–25, 576 A.2d 766 (1990) (holding that Governor's action in vetoing legislation is a legislative act)). The Court has made clear that "[u]nder our cases, delegations of legislative power to executive branch agencies or officials ordinarily do not violate the constitutional separation of pow-

ers requirement as long as guidelines or safeguards, sufficient under the circumstances, are contained in the pertinent statute or statutes." *Christ v. Md. Dep't of Natural Res.*, 335 Md. 427, 441, 644 A.2d 34 (1994) (citations omitted); *see also Judy*, 331 Md. at 263–64, 627 A.2d 1039; *Governor v. Exxon Corp.*, 279 Md. 410, 440, 370 A.2d 1102 (1977). If the Charter delegates such "legislative power" to the County Executive, as the County argues, then Charter §§ 303 and 511, along with the MCC collective bargaining provisions, are guidelines or safeguards for the exercise of that power.

## II. Prohibited Practice Ruling

█ Having determined that the Charter permits the Council to legislate what the County Executive must include in the budget proposal, we now turn to the issue of whether the County Executive's failure to include the 2011 Agreement was a prohibited practice. To determine if a prohibited practice occurred, we must determine what the MCC collective bargaining provisions related to the Union require. MCC §§ 33–108(f)(6) states that "any provision which requires action in the County budget must be included in the budget which the employer submits to the County Council." (Emphasis added).

The code is unambiguous. The County Executive must include in the budget any provision from the parties' final agreement that will require action. *See* MCC § 33–108(f)(6). The LBFO selected by the Arbitrator constituted the parties' final agreement. The Union argues that the award affects the budget and requires funding and, therefore, must be included as part of the budget. We agree. In reviewing the collective bargaining statutes as an entire statutory scheme and harmonizing the provisions related to the Union, the police, and the fire fighters, we hold that § 33–108(g) also requires the County Executive to include any CBA and its funding in the proposed budget that is submitted to the Council.

The County avers that the County Executive submitted the award to the Council, albeit not as part of the formal FY12 Budget. This does not comport with our interpretation of

what is required under the statute, and we are not persuaded by the County's argument that the Union had ample opportunity to advocate for the Council to reject the County Executive's budget and implement the 2011 Agreement. Nor is such an argument dispositive of the prohibited practice charge unless the statute requires no more of the County Executive.

MCC § 33–154(a)(8) states that it is a prohibited practice for the employer to "directly or indirectly oppose the appropriation of funds or the enactment of legislation by the County Council to implement an agreement reached under this Article[.]" Refusing to abide by the statute requiring an arbitrator's award, if it requires action in the budget, to be included in the proposed budget serves to indirectly oppose the appropriation of funds sufficient to implement any agreement.

Moreover, a Memorandum dated March 29, 2011, from the County Executive to the Council, with the subject "Fiscal Impact Statement—FY12 Labor Agreements between Montgomery County Government and Municipal and County Government Employees Organization (MCGEO), Local 1994, International Association of Fire Fighters (IAFF), Local 1664, Fraternal Order of Police, Lodge 35, and Montgomery County Volunteer Fire Rescue Association (MCVRFA)," briefly explains what the arbitrator awarded to each union, but then accounts in detail why the County Executive prefers restructuring and implies that the County Executive's proposals are the only way to save the County "nearly $30 million in FY12." The attachments to the Memorandum are fiscal impact statements written so as to illustrate what the award will cost the County and are not a side-by-side comparison of the County Executive's LBFO and the Fire Fighters' LBFO.

The Charter does not permit the County Executive to determine how the information is to be presented to the Council. As discussed, the Charter requires the County Executive to include the "information in such form and detail" as prescribed in the relevant MCC provisions. The County Executive's description of the arbitrated award is clearly designed to sway the Council into disfavoring it; this indirect

interference is a prohibited practice. We agree that the Arbitrator's decision that the County Executive committed a prohibited practice is correct as a matter of law and supported by substantial evidence.

The County argues that the County Executive's actions fall under MCC § 33–110(a), which states:

> The expression or dissemination of any views, argument, or opinion, orally, in writing, or otherwise, does not constitute and is not evidence of a prohibited practice under any of the provisions of this article, nor is it grounds for invalidating any election conducted under this article if the expression or dissemination does not contain a threat of reprisal or promise of benefit.

The County cites no authority in support of its position that this section encompasses the County Executive's budgetary omission, and we have been unable to discern any. A plain reading of the section indicates that it addresses the expression of views regarding the union itself, not the budget or an award. The County has not contended that the County Executive, in refusing to include any part of the award in the FY12 Budget, was expressing his opinion of the Union and, therefore, we do not hold that § 33–110(a) relieves the County Executive of his statutory budget responsibilities or protects him from a prohibited practice charge.

The County also argues that requiring the County Executive to include the 2011 Agreement in the FY12 Budget amounts to "[c]ompelling an individual to affirm a belief that the individual does not hold [and] is repugnant to the principals [sic] protected under the First Amendment of the U.S. Constitution." To the contrary, the County Executive is not expressing his views as a private citizen on a matter of public concern when he submits the budget; he is acting in his official capacity as the head of the executive branch.

It is well established that restraints may be imposed "on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 465, 115

S.Ct. 1003, 130 L.Ed.2d 964 (1995) (citation omitted). The instant case does not present a situation in which the County Executive is precluded from exercising his right to speech. In fact, the County Executive is required to advocate his views in the bargaining process, up to the submission of a LBFO should the parties reach an impasse. The statute requiring the County Executive to submit an arbitrated award promotes the efficiency of the budget and collective bargaining processes. *See Borough of Duryea v. Guarnieri,* —— U.S. ——, 131 S.Ct. 2488, 2500, 180 L.Ed.2d 408 (2011) ("If the interference with the government's operations is such that the balance favors the employer, the employee's First Amendment claim will fail even though the petition is on a matter of public concern.").

### III. Legislative Immunity

■ The Union argues that the County Executive's actions were not protected by the doctrine of legislative immunity because budget-making is not a legislative act. The County argues that because proposing a budget is tantamount to "introducing legislation," the County Executive "is also clothed with legislative immunity and cannot be called to account before an arbitrator for an exercise of his legislative discretion."

We note that the Restatement (Second) of Torts § 895D, states that "[a] public officer acting within the general scope of his authority is immune from tort liability for an act or omission involving the exercise of a judicial or legislative function." The Court of Appeals has explained that a "governmental representative is entitled to public official immunity under the common law when he or she is acting as a public official, when the tortious conduct occurred while that person was performing discretionary rather than ministerial acts, and when the representative acted without malice." *D'Aoust,* 424 Md. at 586, 36 A.3d 941. This Court has recognized that the immunity broadly protects local legislators from having to defend their legislative actions in suit. *State v. Holton,* 193 Md.App. 322, 368, 997 A.2d 828 (2010).

The County argues that legislative immunity also precludes the County Executive from having to "answer to an arbitrator for the exercise of discretionary legislative responsibilities, such as recommending a budget." To this end, the County relies on *Mont. Cnty. v. Schooley*, 97 Md.App. 107, 627 A.2d 69 (1993). However, while *Schooley* discusses how legislative privilege is akin to legislative immunity, that case dealt with Council members meeting to enact legislation, not an executive engaged in a ministerial function of adding a required submission to a piece of proposed legislation.

Assuming, *arguendo*, that the County Executive's inclusion of funding to implement any CBA is legislative, that does not compel the conclusion that the County Executive's actions during that process cannot be evaluated for the existence of a prohibited practice. The common themes of the decisions addressing immunity are the function being performed by the official and the amount of discretion involved in the performance of that function. However, the policy behind the immunity is to refrain from chilling the ability of officials to exercise their discretion in carrying out their official duties. As the Court of Appeals stated in *Mandel:*

The Supreme Court noted that official immunity apparently rests on two rationales, (1) the injustice of subjecting to liability an officer who is legally required to exercise discretion, particularly absent bad faith, and (2) the danger of deterring willingness to exercise judgment with decisiveness posed by the threat of liability.

320 Md. at 116–17, 576 A.2d 766 (citation omitted).

As discussed, the County Executive has no discretion, by enactment of the Council, regarding whether to include funding to implement the 2011 Agreement in the proposed budget. Therefore, neither of the rationales raised by the Court in *Mandel* apply. The concerns about the County Executive's ability to exercise his discretion are legitimate, but the Council provided an opportunity for the County Executive to have discretion—during the collective bargaining process itself. Once that process is complete, by agreement or impasse, the

Council stripped the County Executive of any discretion regarding the inclusion of the CBAs and their funding in the budget, making the function ministerial.

Moreover, any immunity arising from the Executive's "legislative" activities is "a matter of Maryland common law." *Mandel,* 320 Md. at 134, 576 A.2d 766. As a charter county, the Council can change the common law by statute. *County Council for Mont. Cnty. v. Investors Funding,* 270 Md. 403, 416–19, 312 A.2d 225 (1973). The Council did so by enacting the prohibited practice provisions of the MCC. Accordingly, we hold that the County Executive is not entitled to invoke legislative immunity to avoid being "called to account" for a prohibited practice charge.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. CASE REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY MONTGOMERY COUNTY.**